## In re PFAFFINGER.

## LOUISVILLE NAT. BANKING CO. v. PFAFFINGER'S TRUSTEE.

### (District Court, W. D. Kentucky. June 6, 1906.)

1. BANKRUPTCY—VOIDABLE PREFERENCE.

In order to render a preference voidable under Bankr. Act July 1, 1898, § 60b, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445], which provides that it shall be voidable if the creditor receiving it or his agent "shall have had reasonable cause to believe that it was intended thereby to give a preference," it must appear that the creditor had reasonable cause to believe that the debtor was then insolvent within the meaning of such term as defined by the act.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 256.]

2. SAME—PREFERENCES REQUIRED TO BE SURRENDERED BEFORE ALLOWANCE OF CLAIM—BURDEN OF PROOF.

The burden of proof rests upon a trustee in bankruptcy who objects to the allowance of a claim until the surrender of an alleged preference, as required by Bankr. Act July 1, 1898, § 57g, c. 541, 30 Stat. 560 [U. S. Comp. St. 1901, p. 3445], as amended February 5, 1903, c. 487, 32 Stat. 799 [U. S. Comp. St. Supp. 1905, pp. 688, 689], to establish the facts which would render such preference voidable under section 60b, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445].

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 256.]

3. SAME—EVIDENCE CONSIDERED.

A bankrupt who was in business kept an account with a bank for some four years prior to his bankruptcy, and during such time the bank from time to time made him loans and also discounted notes of his customers, which he indorsed and took up at maturity when the customer did not. At the time of opening his account, he gave the president of the bank a statement of his assets and liabilities, which showed him to be abundantly solvent. Within the four months prior to his bankruptcy, he took up a number of customers' notes, and the president also insisted on his paying a note of his own for $1,000 which came due. He then stated to the president that he was hard up on account of slow collections, and requested an extension of five days, which was given, and at the end of that time he paid the note. He was in fact insolvent at that time, but only ascertained it a few days previously on taking an inventory, and did not advise the bank of the fact. The president of the bank testified that he supposed the bankrupt to be making money in his business until notified of his bankruptcy, and only insisted on payment of the note because his indebtedness was larger than was warranted by the amount of his current account. *Held*, that such evidence was insufficient to show that the bank had reasonable cause to believe the bankrupt insolvent when such payments were made, so as to require it to surrender the same as voidable preferences before proving its claim against the estate in bankruptcy.

In Bankruptcy. On review of order of referee.

W. M. Smith, for Banking Co.
Thatcher, Gifford & Steinfeld, for trustee.

EVANS, District Judge. William L. Pfaffinger was adjudicated a bankrupt on his own voluntary petition filed January 9, 1907. After the adjudication the Louisville National Banking Company, a creditor, presented its proofs of various debts against the estate, amounting to $15,792.62. Objection to the allowance of the claims was made by the trustee upon the ground that this creditor had received certain

preferences within four months next preceding the filing of the petition. The referee concluded that such preferences had been made by payments to it as follows:

1906.

| | |
|---|---|
| September 15th | $ 130 00 |
| " 18th | 150 00 |
| October 24th | 135 00 |
| November 8th | 150 00 |
| " 15th | 1,000 00 |
| " 24th | 100 00 |
| December 14th | 200 00 |
| Total, | $1,865 00 |

He consequently ordered the payment by the creditor to the trustee of the full amount of all these sums as a condition precedent to the allowance of any part of the creditor's claims. The creditor has filed its petition for a review by the court of this order.

The applicable provisions of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]), are as follows:

Sec. 60a. "A person shall be deemed to have given a preference if, being insolvent, he has within four months before the petition, * * * made a transfer of any of his property in favor of any person, or made a transfer of any of his property, and the effect * * * of the transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."

Section 60b provides that:

"If a bankrupt shall have given a preference, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee."

Clause 25 of section 1 provides that the word "transfer" shall include—

"the sale and every other and different mode of disposing of or parting with property, or the possession of property, absolutely or conditionally, as a payment, pledge, mortgage, gift, or security."

It will thus be seen that a "payment" is a transfer within the act, and of course the necessary effect of a payment by an insolvent debtor to any creditor is to enable the latter to obtain a greater percentage of his debt than could any other creditor of the same class who did not receive a payment. So that if there were nothing more than section 60a and section 1, clause 25, every payment made within the four months' period would be voidable. But such was not the intention of Congress. And so section 57g provides that claims shall not be allowed unless preferences are surrendered in those cases only where the preference is voidable under section 60b; and that section provides, as we have seen, that if a bankrupt shall have given a preference, and the person receiving it or to be benefited thereby "shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee."

The settled construction of these various provisions of the act appears to be that, in order to make a payment or other form of preference voidable, the person to whom it is made or given must have had

reasonable cause to believe that the person making it was then insolvent; this element being regarded as necessarily included in the phrase "reasonable cause to believe that a preference was intended." Butler Paper Co. v. Goembel, 143 Fed. 298, 74 C. C. A. 434; In re Goodhile (D. C.) 130 Fed. 471.

We are, therefore, to inquire whether this creditor had reasonable cause to believe, when the payments were respectively made to it, that the debtor was insolvent. In doing so we are to remember that by clause 15 of section 1 of the act it is declared that "a person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property * * * shall not, at a fair valuation, be sufficient in amount to pay his debts." We are also to remember that absolute knowledge of insolvency is not required. All that is necessary in such cases is the possession by the creditor, at the time, of such information relative to the debtor's affairs as should lead a reasonably prudent person to conclude that the property of the debtor at a fair valuation would not be sufficient to pay his debts. Grant v. National Bank, 97 U. S. 80, 24 L. Ed. 971; Stucky v. Savings Bank, 108 U. S. 74, 2 Sup. Ct. 219, 27 L. Ed. 640; In re Eggert, 102 Fed. 735, 43 C. C. A. 1; In re Goodhile (D. C.) 130 Fed. 471.

Ex post facto knowledge that the debtor was, at the time of the preference, insolvent is not material. Nor does it matter, per se, what knowledge the debtor had on the subject. The test is whether the creditor who is charged with having received a voidable preference had at the time of receiving it such information as ought to have led a reasonably prudent man to the conclusion that a preference was thereby intended, and this includes, as we have seen, the necessary element of sufficient information of the affairs of the debtor as ought to lead a reasonably prudent man to the conclusion that he was then insolvent. Mere suspicion of insolvency is not sufficient (97 U. S. 81, 24 L. Ed. 971), nor is mere unwillingness to trust further (108 U. S. 75, 2 Sup. Ct. 219, 27 L. Ed. 640). Some authorities, indeed, fix a test to the effect that the creditor must be regarded as having been preferred if at the time of the transfer or payment he had information sufficient to put a reasonably prudent man upon inquiry, which if made and pursued would lead to a full knowledge of the debtor's condition. Such a rule must have a reasonable construction, and to make it operate justly must relate to information of the financial condition and property of the debtor, and not merely to whether he had already borrowed from the creditor quite as much or more money than the latter thought it was best to lend to him for other and different reasons. The rule last stated, even if consistent with that just given as being the rule laid down by the Supreme Court, could not fairly operate upon this case, because, as we shall see, there is no testimony to show that this creditor had any knowledge of the debtor's financial condition and property—in short, of his affairs—except what was shown by its own books, and what was contained in the written statement of March 24, 1903, which showed him to be absolutely solvent, and which was received and acted upon from that time on without suspicion of its accuracy and truthfulness, and the additional information that collections were hard at times with the customer,

as might happen to be the case with any business man. And it is quite important also to remember that, under the present bankruptcy act, temporary inability to meet payments does not constitute insolvency, and consequently notice of that state of a debtor's affairs does not, per se, give information as to his property, nor whether at a fair valuation it is sufficient to pay his debts. Hussey v. Richardson, etc., 148 Fed. 600, 78 C. C. A. 370.

We have now reached a point where we are to inquire whether the testimony in the case fairly shows that at the time of the payments or any of them the creditor or any agent acting for it had the quantum of information respecting its debtor's affairs which was necessary under the law to make the preference voidable. The question is one of fact, and the onus is on the trustee who affirmatively alleges that a preference was given. Butler Paper Co. v. Goembel, 143 Fed. 296, 74 C. C. A. 433. The evidence shows that the debtor was certainly insolvent in the latter part of 1906, and also that the several payments referred to were made within the four months next preceding the filing of the petition. We may always conclude without further testimony that payment to a creditor will necessarily increase his dividends in a case where his debtor is at the time insolvent. Three of the four necessary elements in this case may therefore be regarded as established. Upon the fourth (to wit, whether the creditor had reasonable cause to believe that a preference was intended), only two witnesses were examined, namely, the bankrupt and the president of the banking company. The testimony shows without contradiction that in March, 1903, the bankrupt changed his account from the German Insurance Bank to the Louisville Banking Company, because, at the latter, he could get a lower rate of interest upon money he might have to borrow than he could at the former, namely, a 6 per cent. rate as against a 7 per cent. rate; that when he applied to the latter bank to make the arrangement the bankrupt was required to give a statement in writing purporting to show his financial condition at that time; that he handed the statement to the president of the banking company, Theodore Harris; that it showed the bankrupt's assets then to be $49,674, and his liabilities to be $10,200; that thereafter and until December 24, 1906, he kept his account with the banking company, making his deposits and discounting his notes and bills, and obtaining his loans there, all in the regular course of business, the details of the account during the entire period being shown in a copy thereof filed with the testimony; that the payments made to the banking company between September 15 and December 24, 1906, as shown in the list of payments hereinbefore copied, with the exception of that of $1,000 made November 15th, were made in this way, namely, the bankrupt had discounted with the banking company many notes of his customers, which notes he had indorsed, and when the makers failed to pay any of them he took them up either with checks for the amounts made on his deposits with the banking company, or else the amount of each note was charged up to him in his account; that the bankrupt first realized early in November, 1906, that he was insolvent, but that on November 15, 1906, he paid a five-day note to the banking company for $1,000. The bankrupt testified at some length respecting this transaction.

Giving this testimony its full effect, it amounts shortly to this: That the bankrupt owed to the banking company a note for $1,000 which matured early in November, 1906; that the banking company insisted upon its being paid upon the ground that the bankrupt then owed it more money than it wanted to lend him upon a deposit account no larger than his; that further time upon the note was then requested by the bankrupt upon the only ground stated, that he could not get in collections at that time; that five days' time was thereupon given, and the note renewed; that at its maturity it was paid; that when asked by the banking company from time to time (obviously referring to a period in the latter part of 1906) as to his financial condition, the bankrupt's answer had been that he could not always take up his notes promptly because money matters were hard in the way of collections; that the bankrupt did not himself know of his insolvent condition until after he had had an inventory taken early in November, 1906; that even then he did not tell the banking company of his condition; that he was forced by the banking company to take up the $1,000 note; and that the banking company made him pay in order to reduce his borrowing account. There was no evidence except what related directly to the $1,000 payment. This, however, has been considered as far as it might legitimately bear upon the other payments in question, though, of course, its weight must be regarded as very inconsiderable as to all of them which were made previously to November 1, 1906. Indeed, as to such payments we may say that there was practically no evidence at all in support of the charge of preference.

Waiving the very serious question whether, even if uncontradicted, the testimony offered by the trustee could be regarded as sufficient to support his contention as to any of the payments, we find that Theodore Harris, the president of the banking company, and with whom the business was transacted, after stating that he had never known the bankrupt previous to his application to open an account with the banking company in March, 1903, testified that the bankrupt in March, 1903, had asked to become a customer of the banking company because he said he was paying a higher rate of interest than was desirable where he had been doing his banking; that he was requested and did make a written statement showing his assets and liabilities at the time; that the statement furnished showed the former to be $49,674, and the latter to be only $10,200; that witness thus understood the bankrupt to be perfectly solvent; that for the succeeding years the banking company loaned him money as he needed it, and discounted his business paper in the regular way, and also kept his deposit account; that as the bankrupt was a hard-working, economical man the witness never doubted that he was making money and doing fairly well in his business, but as his borrowing account was too large in proportion to his deposit account to meet the banking company's views, witness told the bankrupt that that account must be reduced; that this was done when a certain $1,000 note matured early in November, 1906, and payment in cash was demanded; that the bankrupt stated that his collections of money were a little hard at the time and asked for some indulgence; that five days were mentioned and readily given, and the note renewed for that period; that 30 days' time would have been given if that

much had been requested; that the $1,000 note was promptly paid at maturity; and that the witness not only thought the bankrupt was solvent during all this time, but had no suspicion to the contrary until informed thereof by the bankrupt's attorney in January, 1907.

Without determining whether the testimony offered by the trustee, if taken alone, would support the charge of preference, we are content to say that a very careful consideration of all the evidence has led us to the clear conviction that it by no means supports the emphasized conclusion of the learned referee that the bankrupt "informed the banking company or its president that he (the bankrupt) had not the means and could not pay the $1,000." On the contrary, the bankrupt could, and in fact did, pay that note at maturity with means at his command, and what he had told the banking company was that he was hard up for collections, and he had told this not at the time of the payment of the $1,000, but as a reason why he asked for the extension of time when the note therefor was last renewed. In speaking of the deposition of Mr. Krieger in the case of Stucky, Assignee, v. Masonic Savings Bank, 108 U. S. 75, 2 Sup. Ct. 220, 27 L. Ed. 640, the Supreme Court said:

"We have examined his deposition very carefully. We think it bears the impress of candor, and negatives the idea that he had reasonable ground to believe Melter insolvent, or that he actually did believe it."

We are tempted to make the same remark about the deposition of Mr. Harris, inasmuch as we entertain a similar opinion respecting it. Besides, our own personal experience has taught us that banks usually dislike a mere borrowing account, and their desire is to keep in close limits, unless the deposit account is liberally kept up in proportion, in which event a bank practically loans a man his own money and gets interest upon it. At all events, after a very careful consideration of the testimony in all its phases, we have reached the conclusion that it does not show that any preference, within the sense of the bankruptcy act, was given to the Louisville Banking Company, and consequently that its claims should have been allowed in full without requiring it to surrender any part of the payments amounting to $1,865 and described in the referee's order herein.

The order of the referee to the contrary must, therefore, be reversed, with directions to allow the claims of the Louisville Banking Company, amounting in the aggregate to $15,792.62.