LANG
v.
**FIRST NAT. BANK IN HOUSTON.**
**No. 14665.**

United States Court of Appeals
Fifth Circuit.
Aug. 25, 1954.

Emanuel Harris, New York City, Thomas B. Weatherly, Houston Tex., Vinson, Elkins, Weems & Searls, Houston, Tex., for appellant.

M. U. S. Kjorlaug and Bruce Billingsley, Boyles & Billingsley, Houston, Tex., for appellee.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

The trustee in bankruptcy of Thomas Bryan & Associates, Inc., appeals from a judgment rejecting his demand for the recovery of funds paid by the bankrupt to the appellee, alleged to have been an illegal preference under Section 60, sub. b of the Bankruptcy Act.[1] The sole question is whether or not appellee had reasonable cause to believe that the debtor was insolvent at the time of the payment.

The bankrupt was a New York corporation doing a large and extensive contracting business and its operations included jobs in several states. During 1950 it had regularly borrowed large sums of money from the appellee bank on short term notes, and with insignificant exceptions, had paid the loans in full at or near the maturity dates. These loans were secured by non-notification assignments of invoices for payment on the jobs the bankrupt was constructing; and it was the practice of the bankrupt to deposit the checks paying these invoices in its account at the appellee bank and to draw checks against its account in payment of the loans.

On December 22, 1950, appellee loaned the bankrupt $125,000, due in 30 days and secured by a non-notification assignment of an invoice to the Atomic Energy Commission, with which the bankrupt had a construction contract in Los Alamos. On December 27, 1950, the appellee made an additional loan of $25,000; another of $100,000 on January 2, 1951; and still another of $35,000 on January 15, 1951.

On January 21, when the December 22 loan became due and was not paid, an officer of the bank called upon the bankrupt and obtained a notification assignment of the invoice, notifying both the Atomic Energy Commission and the surety on the bankrupt's construction bonds. Two days later, appellee loaned the bankrupt an additional $100,000.

Between the date of the last loan and February 8, 1951, the bank's officer had a number of conversations with officers of the bankrupt, who informed him that they were worried about the condition of their company. However, they explained that the difficulty was caused by excessive retainages and penalties on some of their jobs and that as soon as they received the money being withheld the pressure would be relieved. It was explained that over $500,000 was being so retained on the Los Alamos job alone.

On February 8, 1951, the bankrupt received a check from the Atomic Energy Commission in the amount of $41,143.88; which was deposited with the bank and for which sum the debtor drew its own check in payment on its notes.

On February 11, 1951, the surety on the construction company's bond took over the several jobs under its contract; and on February 24 following an involuntary petition in bankruptcy was filed against the corporation in the Southern District of New York.

The trustee brought this suit to recover the $41,143.88 paid February 8, alleging insolvency at that time and that the bank knew or had reasonable cause to believe the construction company was in that condition. Although the bankrupt was found to be insolvent on Febru-

---

1. 52 Stat. 870, 11 U.S.C.A. § 96, sub. b.

ary 8, the court held appellee had no reasonable cause to believe it was and dismissed the trustee's suit.

It is conceded that since all of the evidence was documentary or in the form of written deposition, the findings of the trial court need not be given the weight usually accorded them under Rule 52 of Civil Procedure, 28 U.S.C.A.[2] Hence, the trustee (appellant) points up the following evidentiary facts: that on January 21, when the December 22 loan was not paid, the bank officer called on the bankrupt rather than requesting its agent to call at the bank; that new security was taken for the loan; that according to the bank officer's testimony there was "real difficulty other than just the complaints of people on the job, supplies or subcontractors for unpaid amounts"; that the bank officer was "trying in every way possible to ascertain the true state of affairs"; that the bank officer was "manning the pumps, to try to keep that outfit going until they could complete those critical jobs"; and that Mr. Bryan had told the bank officer he would try to pay the debts out of his private funds if other means failed.

Relying on cases cited[3] to the effect that a creditor put on inquiry by the circumstances of his debtor is chargeable with knowledge of those facts which investigation would reveal, the trustee contends that the circumstances recited above require a finding that the bank had reasonable cause to believe the bankrupt insolvent when it accepted the February 8 payment. This conclusion is strengthened, he says, by the trial court's finding that by February 14, 1951, the fact of the bankrupt's insolvency was well known to all. In support of his argument, he cites Corn Exchange Nat. Bank & Trust Co. v. Klauder, 318 U.S. 434, 63 S.Ct. 679, 87 L.Ed. 884; Coombs v. Merchants

Bank, 2 Cir., 161 F.2d 858; Security-First National Bank v. Quittner, 9 Cir., 176 F.2d 997.

We recognize the rule of the authorities cited in footnote 3, but the question is whether or not the circumstances known to the bank were sufficient to cause a full inquiry into the solvency (in the legal sense) of the bankrupt, and if so, was sufficient inquiry made.

The past relationships between the appellee and the bankrupt had been successful, and we think that it was not unreasonable for the bank officers to take into consideration the nature of the business in which the bankrupt was engaged. It is well known in the business world that at a given time a large contractor may be insolvent in the sense that he owes more money than he has liquid assets; yet this is not necessarily insolvency in the legal sense. Rather it is only a shortage of cash or working capital, a situation which in the ordinary course of events can and will be remedied upon the completion of the contracts and the receipt of payment. His principal assets are not physical property such as real estate, equipment or inventory, but incorporeal rights potentially of great value even though not readily turned into cash.

To be sure, the appellee knew that the bankrupt was having difficulty meeting current obligations—which, after all, was the reason working capital was needed. But it also knew that the bankrupt had several lucrative jobs in progress and that some were near completion. The past experiences with the bankrupt were such that the appellee bank could reasonably expect payment of the loans, and the fact that a loan of $100,000 was made after the December 22 loan was past due is indicative of the confidence its officers had in the bankrupt's position.

---

2. See Equitable Life Assurance Society v. Irelan, 9 Cir., 123 F.2d 462; Sun Insurance Office, Limited, of London v. Bo-Mac Transport Co., 8 Cir., 132 F.2d 535; Letcher County, Ky. v. De Foe, 6 Cir., 151 F.2d 987; McComb v. Utica Knitting Co., 2 Cir., 164 F.2d 670.

3. Collins v. Bank of Titusville & Trust Co. (In re Hendry), 5 Cir., 36 F.2d 482; Pender v. Chatham Phenix Nat. Bank & Trust Co., 2 Cir., 58 F.2d 968; McDougal v. Central Union Conference Ass'n, 10 Cir., 110 F.2d 939.

The slowness with which the bankrupt was meeting some obligations and the fact that it failed to pay the note due on January 21 were circumstances which would cause some inquiry to be made; and one was begun. The bankrupt showed the appellee's officer that there were more than a half-million dollars in retainages on one job alone, explaining that receipt of this amount would remedy the situation considerably.

We think that this explanation was reasonable, and that under all the circumstances the appellee was justified in not making inquiry into the legal solvency of the bankrupt. This being true, there is nothing in the record to require a finding that the payment of February 8 was anything more than a routine transaction similar to other payments made during the preceding year.

Between the date of the payment and February 14, 1951, when the trial court found that all creditors should have known that the bankrupt was insolvent, there occurred the event which we think changed the entire picture. On February 11 the surety on the bankrupt's bonds closed down all jobs. This was done, no doubt, because the surety was convinced that the bankrupt could no longer operate them, a decision which it undoubtedly had a right to make but which stripped the bankrupt of all its potential assets. In one swoop, all possibility of recovery was removed. Who can now say whether or not the bankrupt, given additional financial assistance and the indulgence of his creditors, could have salvaged the business? Certain it is that when this event occurred, all creditors were prevented from "carrying" the company any longer.

One of the leading cases on the issue involved here is Grant v. First National Bank, 97 U.S. 80, 24 L.Ed. 971, which we think aptly expresses the governing principles:

"A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-grounded belief of the fact. He may be unwilling to trust him further; he may feel anxious about his claim, and have a strong desire to secure it,—and yet such belief as the act requires may be wanting. Obtaining additional security, or receiving payment of a debt, under such circumstances is not prohibited by the law. Receiving payment is put in the same category, in the section referred to, as receiving security. Hundreds of men constantly continue to make payments up to the very eve of their failure, which it would be very unjust and disastrous to set aside. And yet this could be done in a large proportion of cases if mere grounds of suspicion of their solvency were sufficient for the purpose.

"The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate; and his creditors, if they know anything of his embarrassments, either participate in the same feeling, or at least are willing to think that there is a possibility of his succeeding. To overhaul and set aside all his transactions with his creditors, made under such circumstances, because there may exist some grounds of suspicion of his inability to carry himself through, would make the bankrupt law an engine of oppression and injustice. *It would, in fact, have the effect of producing bankruptcy in many cases where it might otherwise be avoided.*

"Hence the act, very wisely, as we think, instead of making a payment or a security void for a mere suspicion of the debtor's insolvency, requires, for that purpose, that his creditor should have some reasonable cause to believe him insolvent. He must have a knowledge of some fact or facts calculated to produce such a belief in the mind of an ordinarily intelligent man." (Emphasis supplied.)

We think the facts of this case clearly support, if they do not actually require, the finding of the trial court that the appellee bank did not have reasonable cause to believe the bankrupt insolvent at the time of the payment on February 8. Stucky v. Masonic Savings Bank, 108 U.S. 74, 2 S.Ct. 219, 27 L.Ed. 640; Louisville Nat. Banking Co. v. Pfaffinger's Trustee, D.C., 154 F. 523; Harrison v. Merchants National Bank, 8 Cir., 124 F. 2d 871. The authorities relied upon by the trustee were decided upon facts different from those presented here. Accordingly, the judgment appealed from is

Affirmed.

STRUM, Circuit Judge, participated in the hearing and decision of this cause but died before the opinion was filed.