**Robert K. MAYO et al., as Trustees in Bankruptcy of Twin City Construction Company, Inc., Bankrupt, Appellants.**

v.

**PIONEER BANK & TRUST COMPANY, Appellee.**

**No. 18817.**

United States Court of Appeals
Fifth Circuit.

Dec. 7, 1961.

Rehearing Denied. Jan. 18, 1962.

Cleve Burton, Richard H. Switzer, Shreveport, La., for appellants.

Paul M. Hebert, Baton Rouge, La., for appellee.

Before CAMERON, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The dispute between the parties in this case is the tag-end of the legal controversies caused by the bankruptcy of William A. Gray and the companies through which he conducted his construction business in Shreveport, Louisiana. In an earlier appeal the Trustees in Bankruptcy for Twin City Construction Company, Inc., sought to recover as voidable transfers payments by Twin City to the Pioneer Bank and Trust Company of $50,125, $9,000, and $10,020. The district court entered judgment against the Trustees on all three claims. We affirmed as to the first two but reversed and remanded the case for a redetermination of the third. 5 Cir., 1959, 270 F.2d 823. The district court, after taking additional testimony, again ruled against the Trustees. The sole question on appeal is whether the district judge erred in finding that Pioneer Bank did not have reasonable cause to believe that Twin City was insolvent when it received the $10,020 payment from Twin City January 10, 1956. We hold that this finding was erroneous and that the Trustees are entitled to recover this sum from Pioneer Bank.

William A. Gray engaged in the construction business in Shreveport with apparent success for many years. Since 1945, when the Pioneer Bank was formed, that bank provided all of the financing Gray required in his operations. When he started a new job, Gray generally discussed it with the bank president, E. R. Campbell, who handled his account, and borrowed a sum equal to about ten per cent of the contract price to cover his first payroll. As work progressed, the loan would be renewed; when the contract was completed it would be paid off. These loans were secured by a pledge of the contract proceeds; in addition, the bank held floating mortgages on Gray's home, all his business assets, and his stock in a wholly owned corporation that owned and operated apartment buildings —every asset Gray possessed except his life insurance. The bank repeatedly sought to obtain financial statements from Gray but he fended off these requests and gave it no statements after 1948. In the course of sixty to seventy loans ranging up to $35,000, however, the bank never sustained a loss on its dealings with Gray, and bank officials testified that they held the utmost confidence in Gray's integrity and financial reliability.

In May 1955 Gray discussed with Campbell plans to activate a wholly owned corporation, Twin City Construction Company, Inc., and to channel his business operations into the corporation to

avoid personal liability and to provide continuity in case his ill health should force an end to his activities. Gray had organized the corporation in 1951, but it had no paid-in capital stock and had lain dormant until 1955. Pioneer Bank made a personal loan to Gray of $50,000 and at Gray's direction credited the funds to the account of Twin City. By depositing the $50,000 to Twin City's account Gray was able to show the sum as a cash asset on the Twin City balance sheet. This maneuver enabled him to obtain a performance bond for his bid on a $190,-000 Government construction contract at Blytheville, Arkansas. Almost immediately after obtaining his performance bond, Gray transferred the $50,000 from the Twin City account back to the bank in redemption of his personal note. Gray had supplied the bank with Twin City corporate resolutions authorizing the bank to honor, certify, or pay all instruments signed by a Twin City officer although the instruments might be presented in payment of the personal obligation of the officer or for deposit to his personal account. Gray informed Campbell that he had obtained the Blytheville contract, and the bank issued a $19,000 loan to Twin City July 1, 1955, which Twin City repaid August 5. This was the only contract handled by Twin City, although Gray continued several other construction contracts through the W. A. Gray Construction Company. The bank made no further loans to Twin City until December 29.

November 9, 1955, Twin City drew a $20,000 check payable to W. A. Gray Construction Company, the unincorporated vehicle of Gray's earlier operations. December 15 Twin City drew a second check on its account with the Pioneer Bank payable to W. A. Gray Construction Company, in the amount of $4,000. December 29 Gray drew a check for $9,000 on the Twin City account and deposited it in his personal account, the funds being thereafter used to pay creditors of W. A. Gray Construction Company. The same day he applied for and obtained a thirty-day $10,000 loan to Twin City. In a letter accompanying his application he stated that the work on the Blytheville job was 99 per cent finished, and that Twin City had a balance of $42,331 due to it on the contract price. Five days later, January 3, 1956, Gray walked into Campbell's office and announced that he was in financial ruin, that he was "throwing up his hands." When Campbell inquired about Twin City a day or two later, however, Gray told him that it was solvent and would continue operations. January 10 Twin City deposited a check for $11,693, received as part payment on its contract, and authorized Pioneer Bank to apply the funds in payment of its $10,020 note. In March Gray was adjudicated a bankrupt, owing $794,278 in unsecured claims and $5,436 in taxes. He had assets of $8,771. Twin City was adjudicated a bankrupt April 21, 1956. It had assets of $91.14 to apply to unsecured debts of $71,045 and $4,531 in taxes owed.

The Trustees contend that the payment of the loan constituted a voidable preference under the Bankruptcy Act, 11 U.S. C.A. § 96(a) and (b). Section 96(a) provides that six statutory elements must be shown to exist before a preference is established. Section 96(b) imposes the further requirement that the transferee who received the alleged preference must have had "reasonable cause to believe that the debtor is insolvent" at the time of the transfer. See 3 Collier on Bankruptcy § 60, at 752. In our earlier decision we held that as to the January 10 transfer all elements of a voidable preference had been proved except two: that Twin City was insolvent at the time of the transfer and that the bank had reasonable cause to believe that it was insolvent. On remand the district court concluded that Twin City was insolvent, a finding not disputed on appeal. It also found, however, that Pioneer Bank did not have reasonable cause to believe the corporation was insolvent.

Cases on the point have evolved a fine line to apply in determining whether a creditor has "reasonable cause to believe" that a debtor is insolvent. For

reasonable cause to exist, it is not necessary that a person benefitted by a transfer know positively that the result of the transaction will be to effect a preference: it is sufficient for a finding of reasonable cause that the person or his agent has knowledge of such facts as would induce a person of reasonable prudence to make inquiry, when such inquiry would have developed the facts essential to a knowledge of the situation. On the other hand, if the known facts should raise only a suspicion that the debtor might be insolvent, the test is not met. Compare Marks v. Goodyear Rubber Sundries, 2 Cir., 1956, 238 F.2d 533, 62 A.L.R.2d 770 with Lang v. First National Bank in Houston, 5 Cir., 1954, 215 F.2d 118. See 3 Collier on Bankruptcy § 60.53. A multitude of cases support this narrowly defined legal standard, although we have found none applying it to facts closely analogous to those of the instant case.

 Under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. the trial judge's findings of fact are conclusive unless clearly erroneous, but when the factual determination is primarily a matter of drawing inferences from undisputed facts or determining their legal implications, appellate review is far broader than where disputed evidence and questions of credibility are involved. Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186; Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217. Our scope of review in this case is broad, since the decision turns not on what the officers of the bank in fact believed, but on what they had "reasonable cause" to believe; and, most of the basic facts are undisputed. In determining the circumstances known to the Pioneer Bank we must of course attribute the knowledge of its president and other employees to the bank. Waite v. Second National Bank of Belvidere, Ill., 7 Cir., 1948, 168 F.2d 984.

Two principal reasons convince us that Pioneer Bank through its officers and especially through Campbell, the president, did have ample reason to believe that Twin City was insolvent January 10:

(1) Campbell knew that Twin City was a corporation of slight financial backbone; and (2) Campbell knew that Twin City was so integral a part of Gray's own industrial and financial operations that Gray's personal financial ruin would strongly indicate the depletion of Twin City's assets. He knew that Twin City had no assets at all prior to May 1955. He knew that Gray borrowed $50,000 to put in Twin City's bank account, but that Twin City soon thereafter repaid that sum to the bank. He knew, therefore, that Twin City was starting work on its first and only contract with no financial resources behind it; because of the long history of his transactions between Gray and the Pioneer Bank Campbell could feel certain that if Gray had sought funds for Twin City he would have gone first to the bank. From this it should have been apparent that the only assets Twin City could have would be those representing its profit, if any, on the Blytheville contract. All the costs of work on that contract had to be paid out of its proceeds, since the corporation had no other funds with which to pay them. This, of course, does not by itself demonstrate that the corporation would be insolvent, but it does establish the first step from which that conclusion should have followed: that the corporation was in shaky financial condition, and very little would be required to push it into insolvency.

Campbell and other officials of Pioneer Bank were thoroughly familiar with William Gray's operations. They were deceived as to his impending financial disaster, but they were informed enough to know that Gray was a one-man operator and that his companies were only vehicles for his personal operations. The bank had received Twin City resolutions authorizing Gray to apply corporate assets to his personal use, and Campbell knew that Gray had withdrawn $50,000 from the corporate account to redeem his personal note to the bank. Had he checked the bank records he would have discovered the Twin City checks of $20,000 and $4,000 to the W. A. Gray Construction Company and the $9,000 check to Gray

himself. The knowledge of the removal of these assets from the Twin City account would have indicated that Twin City had been deprived of its profit on the Blytheville contract and therefore was probably insolvent as a matter of arithmetic. Still more significantly, such knowledge should have demonstrated that Gray was treating the corporate assets interchangeably with his own, strongly suggesting that Gray's personal financial ruin would spell the ruin of the corporation as well. On the basis of the facts then known to the bank, one would have to assume that Gray would use the assets of Twin City to stave off his own ruin, if any had been available.

Implicit in the apparently apathetic attitude of the Bank's officers was their reliance on the validity of the pledge that this Court later held was invalid. Thinking that the bank was protected by the pledge, it was not unreasonable for the bank to accept payment of its loan and take no affirmative action that might precipitate Gray's ruin. The reasonableness of this attitude, however, has nothing to do with the bank's having knowledge of such facts about Gray as would induce a person of reasonable prudence to inquire into the solvency of his alter ego, Twin City.

In short, this is not a case of a creditor's mere suspicion of insolvency. This is a case of the Pioneer Bank's having reasonable cause to believe that the debtor was insolvent when, on January 10, 1956, Twin City paid the bank $10,000.

The judgment is reversed with instructions to enter judgment in favor of appellants.

CAMERON, Circuit Judge.

I dissent.

On Petition for Rehearing

PER CURIAM.

In its petition for rehearing the Pioneer Bank & Trust Company reiterates its contention that it had no reasonable cause to believe Twin City was insolvent on January 10, 1956. The petitioner relies strongly on the test as set forth in Grant v. First National Bank, 1878, 97 U.S. 80, 24 L.Ed. 971 and on this Court's application of the test in Lang v. First National Bank of Houston, 5 Cir., 1954, 215 F.2d 118.

In Grant the Supreme Court stated the standard in the following terms:

"* * * It is not enough that a creditor has some cause to suspect the insolvency of his debtor; but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt. * * *"

Collier phrases it:

"Knowledge of insolvency is not necessary, nor even actual belief thereof; all that is required is a reasonable cause to believe that the debtor was insolvent at the time of the preferential transfer. A creditor has reasonable cause to believe that a debtor is insolvent when such a state of facts is brought to the creditor's notice, respecting the affairs and pecuniary condition of the debtor, as would lead a prudent business person to the conclusion that the debtor is insolvent. Of course, a creditor may not wilfully close his eyes that he might remain in ignorance of his debtor's condition. On the contrary, where circumstances are such as would incite a man of ordinary prudence to make inquiry, the creditor is chargeable with notice of all facts which a reasonably diligent inquiry would have disclosed. In such case, an inquiry of the debtor alone is generally insufficient where his answer, under the circumstances, could readily have been found to be untrue. As a matter of fact, it is the creditor's cause for belief and not the debtor's knowledge, or lack of it, that is important. And if the creditor fails to make an inquiry when he has a duty to do so, he will be charged with all the knowledge which he would

have acquired had he conducted such an investigation." 3 Collier on Bankruptcy § 60.53.

In our original opinion we said:

"For reasonable cause to exist, it is not necessary that a person benefitted by a transfer know positively that the result of the transaction will be to effect a preference: it is sufficient for a finding of reasonable cause that the person or his agent has knowledge of such facts as would induce a person of reasonable prudence to make inquiry, when such inquiry would have developed the facts essential to a knowledge of the situation. On the other hand, if the known facts should raise only a suspicion that the debtor might be insolvent, the test is not met."

We find no necessary conflict between the test as we phrased it and the test as stated in Grant and elaborated on in Collier.

There are certain facts in Lang v. First National Bank of Houston which, if collected and isolated from other facts, support the petitioner's position that Lang presents a stronger case for the trustee's recovery than the instant case. For example, the bankrupt's officers specifically told the bank's officers that they were worried about their company's financial condition. We are more impressed, however, with the facts distinguishing Lang from the instant case. Thus, in Lang the Court pointed out:

"To be sure, the appellee knew that the bankrupt was having difficulty meeting current obligations—which, after all, was the reason working capital was needed. But it also knew that the bankrupt had several lucrative jobs in progress and that some were near completion. * * * The bankrupt showed the appellee's officer that there were more than a half-million dollars in retainages on one job alone, explaining that receipt of this amount would remedy the situation considerably."

This is a crucial distinction. Twin City (Gray) had no "lucrative jobs in progress" with "a half-million dollars in retainages on one job alone". Twin City had only one contract and had been paid almost in full. Moreover, in Lang there was nothing comparable to the alter ego relation of Twin City to Gray. Nor is there the remotest resemblance between Lang's candid, above-board actions and Gray's gyrations.

The Court has again carefully considered the record. The petition for rehearing is

Denied.

CAMERON, Circuit Judge.

I dissent.