PER CURIAM:
 

 The trustee in bankruptcy of Frigitemp Corporation appeals from a judgment rejecting his demand for the recovery of funds paid by the bankrupt to South Central Bell Telephone Company, alleged to have been an illegal preference under section 60b of the Bankruptcy Act of 1898.
 
 [1]
 
 
 *989
 
 The sole question we must decide is whether Bell had reasonable cause to believe that Frigitemp was insolvent at the time of the payment. Finding that it did not, we affirm.
 

 I.
 

 Frigitemp was a publicly-held New York corporation that manufactured and installed furniture, insulation, and galley equipment on board ships. Approximately sixty-five percent of Frigitemp’s assets were represented by contracts being performed by its marine division. One of Frigitemp’s largest contracts was with the Ingalls shipyard in Pascagoula, Mississippi. Frigitemp had nearly 1500 employees in Pascagoula to install materials on board ships. Frigi-temp also operated a manufacturing plant in Gulfport, Mississippi, which fabricated the aluminum furniture installed by its workers. Frigitemp also had large contracts with the Lockheed shipyard in Seattle, Washington, and the General Dynamics shipyard in Quincy, Massachusetts.
 

 Like many companies that perform long-term contracts, Frigitemp experienced cash flow problems and was often slow in paying its creditors. By the end of 1977, however, Frigitemp’s illiquidity had become severe and placed the corporation in jeopardy. Its inability to pay essential suppliers forced Frigitemp to halt work on its contracts with Lockheed and General Dynamics, and both contracts were terminated in February, 1978. Meanwhile, Frigitemp had threatened to stop work on the Ingalls shipyard contract unless Ingalls paid Frigi-temp approximately $6 million in unpaid supplier invoices, Ingalls refused and, in October, 1977, obtained an injunction against Frigitemp’s threatened work stoppage. Under the injunction, Frigitemp was ordered to continue work on the contract, and Ingalls was directed to reimburse Fri-gitemp only for its direct costs until the disputed claims were resolved.
 

 In February, 1978, Frigitemp’s Board of Directors announced that it had approved plans aimed at easing the company’s “severe cash flow problems” that had “caused delays in its performance of various contracts,” including the one with General Dynamics. The Board planned to renegotiate $17 million in bank loans, which were already in default, and contemplated selling certain subsidiaries or divisions. The Board’s announcement, appearing in the
 
 Wall Street Journal
 
 on February 15, 1978, also mentioned that the Board had considered “court or statutory protection,” but had decided that such a step was not “appropriate” at that time.
 

 Bell provided telephone service to Frigi-temp at both of its Mississippi locations. Although Frigitemp’s payments to Bell were often slow in 1976 and 1977, Frigi-temp had always managed to pay its telephone bills in time to avoid an interruption in service. By 1978, Frigitemp had moved its marine division headquarters from New York to Pascagoula, and the company began to pay its telephone bills more promptly. Nevertheless, Frigitemp remained behind in its payments to Bell and received routine notices warning of possible disconnection.
 

 In February, 1978, Bell’s customer representatives called Frigitemp’s Pascagoula office to inquire about the overdue accounts. They spoke to Carl Stark, who had assisted one of Frigitemp’s regional vice-presidents coordinate the marine division’s move from New York to Pascagoula. Stark explained to them that Frigitemp was undergoing “temporary cash flow problems,” which were caused by Ingalls’ failure to pay certain claims made by Frigi-temp. Stark also informed Bell’s customer representatives that the “realigning” of the marine division’s operations from New York to Pascagoula had also caused payment delays.
 

 Between February 15 and 27, 1978, three Frigitemp checks to Bell — in the amounts of $1,748.25, $699.24, and $130.11 — were dishonored and returned to Bell due to insufficient funds.
 

 On March 1, 1978, Courtney Davis became Bell’s Biloxi, Mississippi business office manager, and was responsible for collecting on the Frigitemp account. None of
 
 *990
 
 the dishonored checks had been paid, and Frigitemp remained delinquent on its accounts. Although Davis had read the
 
 Wall Street Journal
 
 article that described Frigi-temp’s woes, she was not concerned about the overdue accounts. Davis’ husband, Charles Davis, was a plant accountant at Frigitemp’s Gulfport facility, and he had assured her that Frigitemp was financially sound and that any cash flow problems were only temporary.
 

 By March 15, 1978, Bell received payments from Frigitemp totalling $39,045.26, most of which was applied to the delinquent bills. On March 20, 1978, Frigitemp filed for bankruptcy, and this suit was subsequently brought.
 

 Under section 60 of the Bankruptcy Act, a trustee in bankruptcy may recover a preferential payment made by the bankrupt within the four months prior to the filing for bankruptcy.
 
 [2]
 
 In order to recover the payment, however, the trustee must prove that the creditor had “reasonable cause to believe” that the debtor was insolvent.
 
 [3]
 
 After a bench trial, the district court held that the trustee had failed to prove that Bell had “reasonable cause to believe” that Frigitemp was insolvent at the time it received payment.
 
 [4]
 
 From this judgment, the trustee appeals.
 

 II.
 

 The test to be applied in determining whether a creditor has “reasonable cause to believe” that a debtor is insolvent has been explained by Judge Wisdom as follows:
 

 For reasonable cause to exist, it is not necessary that a person benefitted by a transfer know positively that the result of the transaction will be to effect a preference: it is sufficient for a finding of reasonable cause that the person or his agent has knowledge of such facts as would induce a person of reasonable prudence to make inquiry, when such inquiry would have developed the facts essential to a knowledge of the situation. On the other hand, if the known facts should raise only a suspicion that the debtor might be insolvent, the test is not met.
 

 Mayo v. Pioneer Bank & Trust Co.,
 
 297 F.2d 392, 395 (5th Cir.1961).
 

 In this case, the parties are not in dispute as to the facts of Frigitemp’s plight that were known to Bell prior to Frigitemp’s bankruptcy. This being so, our scope of review is not as limited as it would be under the clearly erroneous test. In
 
 Mayo v. Pioneer Bank, supra,
 
 we held that “when the factual determination [whether the creditor had concerning “reasonable cause to believe” the debtor was insolvent] is primarily a matter of drawing inferences from undisputed facts or determining their legal implications, appellate review is far broader than where disputed evidence and questions of credibility are involved.”
 
 Id.
 
 at 395.
 
 See also International Minerals & Chemical Corp. v. Moore,
 
 361 F.2d 849, 851 n. 1 (5th Cir.1966);
 
 Clower v. First State Bank of San Diego, Texas,
 
 343 F.2d
 
 *991
 
 808, 810 (5th Cir.1965). Accordingly, our scope of review in this case is broad, since the district court’s finding turns not on what Bell in fact believed, but on what Bell had “reasonable cause” to believe.
 

 In holding that Bell did not have “reasonable cause to believe” that Frigitemp was insolvent, the district court relied primarily upon
 
 Lang v. First National Bank of Houston,
 
 215 F.2d 118 (5th Cir.1954). In
 
 Lang,
 
 the debtor, a construction company, had borrowed several large sums of money from the First National Bank of Houston. The loans were secured by assignments of invoices for payment due on jobs the debtor was performing. When the debtor defaulted on one of these notes, the bank continued to make the debtor loans but subsequently held conversations with the debtor regarding the latter’s ability to meet its obligations. Although officers of the debt- or admitted to the bank that they worried about the financial condition of their company, they explained that the current difficulty was caused by excessive retainages and penalties on some of their contracts, and that as soon as they received the money being withheld, the pressure would be relieved.
 
 Id.
 
 at 119. Following these conversations, the bank received payment on some of its loans and, shortly thereafter, the debtor filed for bankruptcy.
 

 Although the trustee argued that the bank had “reasonable cause to believe” that the debtor was insolvent at the time of the preferential transfer, we held the contrary. Under the Bankruptcy Act, the definition of insolvency is not based upon an ability to meet debts as they become due, but rather upon an insufficiency of assets to pay debts. In this vein, we noted that:
 

 The past relationships between the [bank] and the [debtor] had been successful, and we think that it was not unreasonable for the bank officers to take into consideration the nature of the business in which the [debtor] was engaged. It is well known in the business world that at a given time a large contractor may be insolvent in the sense that he owes more money than he has liquid assets; yet this is not necessarily insolvency in the legal sense. Rather it is only a shortage of cash or working capital, a situation which in the ordinary course of events can and will be remedied upon the completion of the contracts and the receipt of payment.
 

 Id.
 
 at 120.
 

 Because the debtor had failed to pay one of its loans when due, we agreed with the trustee that there was cause for the bank to make some inquiry, and one was made. The debtor had explained to the bank that over $500,000 had been retained on one job alone, and that receipt of this amount would help to remedy the situation. We concluded that this explanation was sufficient to alleviate the bank’s fears concerning the debtor’s solvency, and that no further inquiry was necessary.
 

 In the instant case, the district court found that Bell knew that Frigitemp was having financial difficulties and that it had been slow in paying its bills. Nonetheless, the court held that Bell could have reasonably concluded that Frigitemp had failed to pay its bills because contractors often experienced delays in receiving payment for jobs. The court also noted that Frigitemp’s contract with the Ingalls shipyard appeared to be a lucrative one, and that Bell could have reasonably relied upon Frigitemp’s assurances that its present illiquidity was caused by its dispute with Ingalls concerning payments due.
 

 Despite the obvious parallels between this case and
 
 Lang,
 
 the trustee argues that a “prudent business person” would not have believed Frigitemp was solvent at the time of the alleged preferential transfers. Bell knew that Frigitemp’s accounts were more than four months delinquent, and that by the end of February, three of Frigitemp’s checks had bounced. Moreover, Bell had read the
 
 Wall Street Journal
 
 article detailing Frigitemp’s inability to pay its essential suppliers and the default on its bank loans. The trustee notes that actual knowledge or belief of insolvency is not necessary; all that is required is a “reasonable cause to believe”
 
 *992
 
 that the debtor was insolvent.
 
 See 3 Collier on Bankruptcy
 
 ¶ 60.53, at 1057 (14th ed. 1977).
 

 ' Certainly these facts highlighted by the trustee would arouse a suspicion that Frigitemp might be insolvent. We believe, however, that there were other facts known to Bell that could have reasonably allayed its fears. While Frigitemp had remained delinquent on its bills by the time Bell received .payment in March, 1978, Fri-gitemp had a history of paying its bills late. Thus, this was not an event that would cause alarm. Although three Frigitemp checks to Bell were returned for insufficient funds, we do not attach as much significance to this fact as the trustee urges. In most “reasonable cause” cases, the debtor either sent checks that bounced or failed to pay loans that were due. This fact alone cannot be dispositive; moreover, without its presence, the trustee would face a difficult task in proving that the creditor had reason to believe that the debt- or was insolvent.
 
 [5]
 

 Although Frigitemp’s Board of Directors announced that the company had been unable to continue work on some of its contracts, and that “court or statutory protection” had been considered, we must be mindful that Bell was dealing with Frigi-temp’s marine division, which represented the bulk of the corporations assets, and that by all appearances known to Bell, the Ingalls shipyard contract would be profitable and ease the company’s present cash shortage. Courtney Davis, Bell’s business office manager, had been assured by her husband that Frigitemp was financially sound. Furthermore, Carl Stark had explained to Bell’s representatives that Frigi-temp’s inability to collect on payments due from Ingalls had put Frigitemp in a bind, yet he expressed optimism that Frigitemp’s dispute with Ingalls would soon be settled, thereby enabling Frigitemp to pay its bills.
 
 [6]
 

 The trustee contends that even if Frigi-temp’s explanations were sufficient to alleviate Bell’s concerns about Frigitemp’s solvency, a prudent businessman would not have relied solely upon Frigitemp’s assurances, but would instead have contacted other creditors to apprise himself of the debtor’s situation. In support, the trustee cites 3
 
 Collier on Bankruptcy
 
 11 60.53, at 1063-64:
 

 [WJhere circumstances are such as would incite a man of ordinary prudence to make inquiry, the creditor is chargeable with notice of all facts which a reasonable diligent inquiry would have disclosed. In such case, an inquiry of the debtor alone is generally insufficient where his answer, under the circumstances, could readily have been found to be untrue.
 

 
 *993
 
 (Footnotes omitted.) The trustee notes that by late February, 1978, one of Frigi-temp’s suppliers had replevied the aluminum essential to the Ingalls contract, and union employees at Frigitemp’s Gulfport plant were threatening to strike unless delinquent welfare fund contributions were made. The trustee contends that had Bell contacted these creditors, it would have known of Frigitemp’s true position; yet Bell’s employees testified that it was company policy never to contact creditors outside the telephone company network regarding á customer’s failure to pay its bills.
 

 The trustee’s argument here is persuasive; however, we note that there is ample authority that “a debtor’s assurance of solvency may be sufficient to negate further inquiries when the creditor has no reason to suspect either the integrity or the accuracy of the information of the informant.” 3
 
 Collier on Bankruptcy
 
 H 60.53, at 1066 n. 5.
 
 See, e.g., Seligson v. Roth,
 
 402 F.2d 883, 887 (8th Cir.1968);
 
 Shaw v. United States Rubber Co., Naugatuck Chemical Division,
 
 361 F.2d 679, 682 (5th Cir.1966);
 
 Employers Mutual Casualty Co. v. Hinshaw,
 
 309 F.2d 806, 808-09 (8th Cir.1962);
 
 Lang v. First National Bank of Houston,
 
 215 F.2d at 120-21. The district court found that Stark, who had helped coordinate the move of Frigitemp’s marine division from New York to Pascagoula, was intimately involved with the business and financial condition of Frigitemp, and that Bell had no reason to suspect that Stark’s explanation of Frigitemp’s cash flow problems was unreliable.
 
 [7]
 
 Moreover, Bell was not a creditor who was intimately involved with the financing of Frigitemp’s business, as a bank might have been. Where a creditor exercises significant control over a debtor’s business and financial affairs, we have often found that such creditors usually possessed information that would cause them to be skeptical of a debtor’s assurances.
 
 See, e.g., Brunson v. First National Bank of Bryan,
 
 405 F.2d 1193, 1194 (5th Cir.1969);
 
 Mayo v. Pioneer Bank & Trust Co.,
 
 297 F.2d 392 (5th Cir.1961). As Bell points out, “[H]ere we deal with a large creditor and a large debtor, each having thousands of customers, no intimate business relationship, and very little personal contact in rendering and receiving telephone service and charging and collecting for it.” - Brief for Appellee at 12. Thus, in these circumstances, we believe that Bell’s inquiry into Frigitemp’s "business affairs was adequate.
 
 [8]
 

 
 *994
 
 III.
 

 The line that must be drawn between finding that a creditor had a mere suspicion that the debtor was insolvent, as opposed to “reasonable cause” to believe the debtor was insolvent, is, indeed, a “fine” one.
 
 See Mayo v. Pioneer Bank & Trust Co.,
 
 297 F.2d at 394. Although the trustee has advanced strong arguments in his favor, we believe
 
 Lang
 
 is controlling. Moreover, we believe that the oft-quoted words of the Supreme Court in
 
 Grant v. First National Bank,
 
 97 U.S. 80, 80, 24 L.Ed. 971 (1898), bear repeating:
 

 A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-grounded belief of the fact. He may be unwilling to trust him further; he may feel anxious about his claim, and have a strong desire to secure it, — and yet such belief as the act requires may be wanting. Obtaining additional security, or receiving payment of a debt, under such circumstances is not prohibited by the law. Receiving payment is put in the same category, in the section referred to, as receiving security. - Hundreds of men constantly continue to make payments up to” the very eve of their failure, which it would be very unjust and disastrous to set- aside. And yet this could be done in a large proportion of cases if mere grounds of suspicion of their solvency were sufficient for the purpose.
 

 The debtor is often buoyed up by the hope of being able to get through with his' difficulties long after his ease is in fact desperate; and his creditors, if they know anything of his embarrassments, either participate in the same feeling, or at least are willing to think that there is a possibility of his succeeding. To overhaul and set aside all his transactions with' his creditors, made under such circumstances, because there may exist some grounds of suspicion of his inability to carry himself through, would make the bankrupt law an engine of oppression and injustice. It would, in fact, have the effect of producing bankruptcy in many cases where it might otherwise be avoided.
 

 We think that this reasoning is particularly persuasive in the case before us, where the creditor provided a basic utility service essential to the functioning of any business entity. Thus, we hold that the trustee failed to prove by a preponderance of the evidence that Bell had “reasonable cause to believe” that Frigitemp was insolvent at the time of the alleged preferential transfer.
 
 [9]
 
 The judgment of the district court is AFFIRMED.
 

 [1]
 

 . This action was commenced before October 1, 1979; therefore, the former Bankruptcy Act controls.
 
 In re Cross,
 
 666 F.2d 873 (5th Cir. 1982);
 
 Nicholson v. First Investment Co.,
 
 705 F.2d 410 (11th Cir.1983).
 

 [2]
 

 . 11 U.S.C. § 96(a)(1) (1976) (repealed) defines a preferential transfer as:
 

 [A] transfer ... of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.
 

 [3]
 

 . 11 U.S.C. § 96(b) (1976) (repealed) provides,
 
 inter alia,
 
 that “[a]ny such preference [as defined in § 96(a) ] may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent."
 

 [4]
 

 .The parties stipulated that all but one of the elements of a preferential transfer were present; however, Bell contended that the trustee had failed to show that the payments were made on account of an antecedent debt depleting the debtor’s estate. Because the district court found that the trustee had failed to prove that Bell had reasonable cause to believe that Frigitemp was insolvent at the time of the payments, it declined to decide whether the trustee had proved that the payments were made on account of an antecedent debt.
 

 [5]
 

 . By no means do we intend to imply that the fact that a debtor's checks were dishonored is not of significance in determining whether the creditor had "reasonable cause to believe” that the debtor was insolvent. There have been several instances where we have acknowledged that such an occurrence was of prime importance in determining whether the trustee was entitled to recover a preferential transfer.
 
 See, e.g., International Minerals & Chemical Corp. v. Moore,
 
 361 F.2d 849, 854 (5th Cir.1966);
 
 Mizell v. Phillips,
 
 240 F.2d 738, 742 n. 5 (5th Cir.1957). On the other hand, bounced checks or defaulted loans can be countered by other facts known to the creditor that give it reasonable cause to believe that the debtor is solvent. "[I]n any consideration of reasonable cause for belief in a debtor's insolvency ... each case must ... to a great extent be decided on its own facts." 3
 
 Collier on Bankruptcy
 
 ¶ 60.52, at 1055 (footnote omitted). Moreover, a presumption exists that payments made by the debtor to creditors are valid, and where two inferences of equivalent weight can be drawn from facts known to the creditor, then that inference that sustains the transfer shall prevail.
 
 Id.
 
 ¶ 60.62, at 1127. The dishonor of Frigitemp’s checks could be as consistent with the theory that Frigitemp was temporarily short of money as it was with the theory that Frigitemp was insolvent.
 

 [6]
 

 . There was also testimony that Bell believed the reason Frigitemp paid its bills late was due to having to circulate them to its various offices for payment. Record Vol. II at 99-100. Moreover, Bell notes that, in an effort to streamline the marine division's telephone equipment in Mississippi, Frigitemp and Bell installed a less expensive telephone system, and that this was not a move that would be made by a large business concern on the eve of bankruptcy, but was rather one calculated to economize, increase cash flow, and ensure future competitiveness.
 

 [7]
 

 . The trustee notes that Charles Davis admitted on cross-examination that he knew that work had stopped on the Lockheed contract; that the aluminum for the Ingalls contract had been replevied by the unpaid supplier; and that the union was threatening to strike the Gulfport plant because of unpaid welfare fund contributions. Yet, Davis also testified that he had not disclosed these matters to his wife, Bell’s business office manager, and thus Bell cannot be charged with knowledge of these facts. The trustee concedes as much.
 

 [8]
 

 . The trustee contends that the district court improperly relied upon Stark’s honest belief that Frigitemp’s problems were only temporary in finding that Bell did not have reason to believe that Frigitemp was insolvent. The district court noted that "Stark ... informed [Bell] ... that Frigitemp was having cash flow problems but that was only of a temporary nature and would be corrected. Mr. Stark further testified that he honestly and truly believed this to be a fact when he imparted this knowledge to the defendant. This was a strong factor in influencing this Court's finding that the defendant creditor was without reason to believe that Frigitemp was insolvent within the meaning of the law, particularly when there was no reason to suspect either the integrity or accuracy of the information of the informant who was intimately knowledgeable of the business and financial condition of Frigitemp.” Record Vol. II at 121— 22. The trustee points out that the debtor’s subjective belief is immaterial to the determination of the creditor's "reasonable cause to believe” that the debtor is insolvent.
 
 See
 
 3
 
 Collier on Bankruptcy
 
 ¶ 60.53, at 1066. While we agree that the test must be what a "reasonable businessman” would believe, we think that the trustee has misread the significance the district court attributed to Stark’s testimony. We believe that Stark’s confidence in Frigitemp’s future was relevant in concluding that Bell could have reasonably believed that Frigitemp was merely undergoing the expected cash shortages contractors often experience. In any case, even if Stark entertained an overly optimistic view of Frigitemp's financial condition, Bell still had no reason to doubt his assurances in the absence of any facts it knew to the contrary.
 

 The trustee also submits that Bell should not have placed so much faith in the assurances of
 
 *994
 
 Frigitemp's local employees in the face of Frigi-temp’s Board’s gloomy announcement. We do not agree. While the short article in the
 
 Wall Street Journal
 
 did paint a bleak picture of Frigi-temp’s future, both Stark and Charles Davis were able to explain why these difficulties had arisen, especially in the marine division, with which they were both quite familiar.
 

 [9]
 

 . Because Bell has failed to prove this element of a voidable preference, we too find it unnecessary to decide whether Frigitemp’s payment was on account of an antecedent debt.
 
 See supra
 
 note 4.