SECURITY–FIRST NAT. BANK OF LOS
ANGELES v. QUITTNER.
No. 12147.

United States Court of Appeals
Ninth Circuit.

Sept. 27, 1949.

Roane Thorpe, Los Angeles, Cal., for appellant.

Irwin R. Buchalter and Richard L. Moss, Los Angeles, Cal., for appellee.

Before HEALY and POPE, Circuit Judges, and YANKWICH, District Judge.

POPE, Circuit Judge.

In consequence of an involuntary petition in bankruptcy filed against her on March 5, 1948, Alvera Gordon Jones was adjudged a bankrupt. Appellee, as trustee in bankruptcy, brought this action to recover, as voidable preferences, sums paid by bankrupt to appellant Security First National Bank of Los Angeles within four months before the filing of the petition.[1] The bank appeals from the judgment for the trustee asserting that the evidence was insufficient to sustain the district court's finding that at the time of the payments the bank "was in possession of such facts concerning the bankrupt's business as would give it reasonable cause to believe that the said bankrupt was insolvent."

The debtor owned and operated 16 beauty shops under the name of "Leroy Gordon Beauty Salons". A number of them were in Los Angeles; others were in various southern California cities. On January 6, 1947, the bank loaned her $2,000 on a note

---

1. Section 60, sub. b of the Bankruptcy Act, Title 11, U.S.C.A. § 96, sub. b.

payable in 90 days. When the note became due, it was renewed for a further period of 90 days. Payment was again extended further successive periods until September 30, 1947. It appears that on each of these occasions the debtor advised the bank that she was unable to make payment, once because of pressing tax obligations, and at other times because of need of capital. At one time the bank endeavored to get her to pay $50 per week on the obligation, but she did not succeed in doing so. About September, 1947, the debtor asked the bank for an additional loan, which was refused. At that time she handed the bank manager a financial statement of her business. It showed a net worth, as of August 31, 1947, of $19,450. It showed liabilities of over $39,000, including a bank overdraft of $3,217, accounts payable of $22,805, and tax liabilities, including unemployment and withholding tax, in excess of $5,200. Listed as assets were $14,120 in furniture and fixtures, "taken from the books", and an item designated "leaseholds", amounting to $5,159.

This statement was returned to the debtor after a few days when her request for further credit was denied. During the period September 30 to December 6, 1947, the bank note remained overdue. Debtor was being pressed for payment by the bank, and continued to advise the bank of her inability to pay. During a considerable portion of this time she had substantial bank overdrafts. The record shows, in addition to the overdraft appearing in the statement mentioned, that during the first ten days of October, 1947, she was continuously overdrawn at the appellant bank for amounts as high as $5,100. There were no overdrafts in this bank during November or thereafter until December 8, 1947. However, her books showed overdrafts on November 30, of $1,774, and on December 31, of $4,993, which would indicate she had transferred her overdrafts to other banks.[2]

On December 6, 1947, the bank obligation which had then been reduced to $1,500 by payments in October and December, was again renewed for 90 days. Debtor had been negotiating for the sale of some of her establishments, or "stores", as she called them, and on January 23, 1948, she paid off the note in full from the proceeds of sale of one of them. She had sold six of the sixteen shops when bankruptcy intervened.

The amount for which judgment was given was the $1,650 which the bank received on its notes in the four months period preceding March 5, 1948 when the petition was filed. The bank manager knew that the process of selling stores had been going forward,—in fact he had advised it, —but he knew nothing as to what sales had been made. There is no contention that the debtor was not insolvent at the times these sums were paid to the bank. The bankrupt scheduled debts of $38,442, and assets of $9,474, including the ten remaining beauty shops.

It was not claimed that the bank or its manager actually knew that the debtor was insolvent when the note was paid. But the trustee undertook to show that the facts which were known to the bank, and which had been called to its attention, were such as would have induced a prudent business person to make inquiries which would have disclosed the debtor's insolvency.

█ In considering the evidence presented, the court below was confronted with a delicate task. Not much help was available from decided cases which, while very numerous, present widely varying conditions and facts. The creditor cannot be charged with knowledge, or its equivalent, where a mere ground for suspicion exists. Grant v. National Bank, 97 U.S. 80, 24 L.Ed. 971. He should not be required to make inquiries which could only appear necessary after

2. The record of the October overdrafts would appear to contradict the bank manager's explanation of them which was that they were allowed only temporarily while money collected by the branch shops was being transferred to this bank from other banks. During the first ten days the overdraft, which was $2,319 on the first, was $4,059 on the second; $5,-100, on the third; $3,456, the fourth; $1,964, the seventh; $1,646, the eighth; $1,124, the ninth, and $788, the tenth. The eleventh produced a credit balance of $106, reduced the same day to $5.60, and there was again an overdraft of $393 on the fourteenth.

he has the hindsight of later events. Due regard must be had for what is common business practice,—the standards of the "prudent business person" should not be unrealistic. Harrison v. Merchants National Bank, 8 Cir., 124 F.2d 871.

But where the evidence is such that different conclusions are warranted, the determination of the question here involved is essentially one for the trial court. For even where there is no doubt or controversy as to what facts came to the attention of the creditor, the question as to whether he acted reasonably in making no further inquiries, in short, whether he had reasonable cause to believe the debtor insolvent, is generally a question of fact. Boston Nat. Bank v. Early, 1 Cir., 17 F.2d 691; In re Eggert, 7 Cir., 102 F. 735; Irving Trust Co. v. Trust Co. of N. J., 2 Cir., 75 F.2d 280; Bostian v. Levich, 8 Cir., 134 F.2d 284. Problems of reasonable conduct arise in many fields of the law. In such cases the questions to be determined, like that of ordinary care, are generally treated as questions of fact.[3]

And if the evidence here be not such as to require us to find the trial court's findings clearly erroneous, we must accept that court's conclusions. Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A.

It appears that the debtor was in financial difficulties throughout the period following her securing of this loan. Her inability to pay the note when due, or at the successive due dates of the renewals, or even on a weekly partial-payment basis, coupled with her large overdrafts, indicate that she could not meet her obligations generally as they matured, and this condition appeared chronic at least after July of 1947.[4] This circumstance alone would not indicate insolvency as that term is defined in the Act. But considered with other facts it has significance. One symptom of illness was the large amount of tax delinquency—failure to account for withholding and unemployment taxes suggests a desperate plight on the part of any employer.[5]

The bank is fairly chargeable with knowledge of the figures given in the August 31 statement. The statement arrived at the net worth shown by listing as an asset "leaseholds" of $5,159. Actually this represented sums which the debtor paid in excess of the true value of shops purchased. While this fact was not explained in the statement, the item itself has an air of unreality about it. The statement also recited that the values attached to "furniture and fixtures" were "taken from the books". The figures on these items were $16,721.03 less depreciation reserve of $2,600.90 with balance of $14,120.13. However sound bookkeeping it may be to carry such items at cost less depreciation based on probable life, which the trial court would be justified in assuming was the case here, a banker considering what used furniture and fixtures would be worth at

3. "There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms 'ordinary care,' 'reasonable prudence,' and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case, may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court." Grand Trunk Railway Co. v. Ives, 144 U.S. 408, 417, 12 S.Ct. 679, 682, 36 L.Ed. 485.

4. The debtor, called as a witness for the trustee, confirmed the following statement concerning the bank manager from her testimony before the referee: "Q. Did you tell him you were having financial difficulties at that time? A. Yes; and he knew that anyway.
"Q. How did he know it? A. Because I hadn't been able to pay them the $2,000 on the monthly basis."

5. The only financial statements furnished the bank to which reference is made in the testimony are the statement of August 31, 1947, previously mentioned, and one of March 31, 1947. The March statement showed "Accrued Taxes Payable" $7352. Its contents were not otherwise in evidence.

a "fair valuation", meaning market value, ought to suspect such a figure.

The bank manager admitted that he made no effort to examine or appraise the debtor's tangible assets, or to compare the statements received for the purpose of noting progress or lack of it, and that although he knew she was selling some of her shops he had no idea which ones, or how much she was getting, or what became of the proceeds.

■ In our view the facts shown to have come to the attention of the bank manager were · such that the trial court might well conclude, as it did, that a reasonably prudent creditor thus informed would have had a look at the debtor's assets, and so have observed her insolvent condition. Under these circumstances, the bank must be charged with knowledge of what ordinary· prudence would have disclosed.

The judgment is affirmed.