In the Matter of **HYGRADE ENVELOPE CORP., Bankrupt.**

**Samuel S. BARANOW, Trustee in Bankruptcy of Hygrade Envelope Corp., Appellant,**

v.

**GIBRALTAR FACTORS CORP., Respondent.**

No. 375, Docket 30319.

United States Court of Appeals Second Circuit.

Argued May 5, 1966.

Decided July 13, 1966.

Modified on Rehearing Sept. 28, 1966.

Abraham L. Popper, New York City (Popper & Popper, New York City), for appellant.

Louis P. Rosenberg, Brooklyn, N. Y., for respondent.

Before LUMBARD, Chief Judge, and MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge:

Hygrade Envelope Corp. was adjudicated a bankrupt in the District Court for the Eastern District of New York pursuant to an involuntary petition filed January 24, 1963. For many years it had been financed by Gibraltar Factors Corp. under an arrangement by which Gibraltar took as security assignments of its accounts receivable; in November, 1962, Hygrade owed Gibraltar more than $300,-000. The key man in Hygrade was its vice president and general manager, Jack Wohl. Gibraltar required Hygrade to take out and assign to it insurance on his life, originally $100,000 but, because one of the policies was a reducing one, only $72,000 in the autumn of 1962. On

November 26, 1962, for reasons recounted below, Gibraltar demanded additional insurance and was assigned another $100,000 term policy on Wohl's life. Although this had a surrender value of only $393, it rapidly matured in consequence of his sudden death on December 5.

When Gibraltar moved in the bankruptcy court for an order permitting it to take possession of certain machinery of Hygrade on which it held a chattel mortgage, the trustee counterclaimed that the transfer of the insurance policy was a voidable preference. The referee found that the trustee had failed to establish that at the time Gibraltar had reasonable cause to believe Hygrade was insolvent as required by § 60b. Accordingly he dismissed the counterclaim; on a petition to review by the trustee, the district court affirmed in a short memorandum.

Because of Wohl's death the trustee was forced to develop his case almost entirely out of the mouth of Gibraltar, specifically Herbert Hurwitz, a vice president who had much to do with the Hygrade account. Hurwitz' testimony, first given at examinations under § 21a and elaborated at trial, disclosed that Gibraltar's practice was to verify the accounts receivable assigned by Hygrade by making monthly spot-checks with selected purchasers. When, a few days before November 26, it sought to make such a verification with Avrick & Co., one of the largest accounts,[1] the report "came back indicating a discrepancy." Gibraltar immediately summoned Wohl to explain this. He admitted that the assigned Avrick accounts represented goods it had not yet ordered, and also

that there were other accounts he had similarly "pre-billed" so that "the amounts shown as due and owing on our books were not in fact due and owing."[2] Hurwitz discussed the situation with his superior who reviewed the file. They decided not to make further inquiry because, as Hurtwitz testified, "For us to have called all his accounts at that time would have been to disrupt his entire business and cause a catastrophe as far as he and we were concerned." Finding that the insurance on Wohl's life, which originally had covered the full line of credit, had become a relatively small fraction of the amount owed, they resolved that Gibraltar must get more insurance. With the $100,000 policy assigned, Gibraltar then made further advances, the first, for $12,500, being secured by a chattel mortgage of $15,000 on equipment, and others, aggregating almost $40,000, being secured by the assignment of accounts receivable represented by invoices of actual shipments.

■ A preference is clearly voidable under § 60b "when such a state of facts is brought to the creditor's notice, respecting the affairs and pecuniary condition of the debtor, as would lead a prudent business person to the conclusion that the debtor is insolvent," 3 Collier, Bankruptcy ¶60.53, at 1057–58 (14th ed. 1964). The statute moreover has been properly read as going somewhat beyond this to preclude a creditor from deliberately closing his eyes so as to remain in ignorance of the debtor's condition; "where circumstances are such as would incite a man of ordinary prudence to make inquiry, the creditor is chargeable with notice of all facts

1. Hygrade's receivable statement showed $53,639 owing from Avrick out of a total of $265,561; only one account, for $57,946, was larger. There were only a half dozen accounts which ran into five figures; these comprised approximately 80% of the total.

2. As Hurwitz stated in his 21a examination,
   "when we called Mr. Wohl to account for this, to the effect that there were bills assigned to us that were not bona

fide, he came to our office and admitted that he had assigned bills which had not come into being yet. We tried to ascertain the extent of that but were unable to do so. He claimed he did not know himself but that he would in due time work everything out and he asked us to please go along with him because if we would cease factoring or financing him at the time it would catapult the business into bankruptcy."

which a reasonable diligent inquiry would have disclosed" and "an inquiry of the debtor alone is generally insufficient." Id. at 1063–65. We have approved this principle in many cases. See, e. g., Levy v. Weinberg & Holman, Inc., 20 F.2d 565, 567 (2 Cir. 1927); Pender v. Chatham Phenix Nat. Bank & Trust Co., 58 F.2d 968, 970 (2 Cir. 1932); Margolis v. Gem Factors Corp., 201 F.2d 803, 805 (2 Cir. 1953); Robinson v. Commercial Bank of North America, 320 F.2d 106, 107–108 (2 Cir. 1963). Knowledge that a debtor securing advances by assignment of accounts receivable had deliberately written up one of its largest accounts to include goods the customer was merely expected to order would beyond doubt incite a man of ordinary prudence to make inquiry. See Margolis v. Gem Factors Corp., supra, 201 F.2d at 805. There could scarcely be a clearer case for considering inquiry of the debtor to be insufficient than where it acknowledged the falsification discovered by the creditor was not the only instance and where this was found in one of the largest accounts. The man of ordinary prudence would at least have proceeded to verify the six big accounts, see fn. 1, and very likely would have insisted on a check of all customers of any significance. What inquiry would have revealed is indicated by Hurwitz' testimony that after Hygrade closed in December and outstanding accounts were collected, there were still some $155,886 in supposed receivables from apparently solvent purchasers on which Gibraltar expected to realize only $10,000. Once such extensive "machinations"—using Hurwitz' expression—had been discovered, a complete audit which would have revealed that Hygrade was insolvent would surely have followed.

Gibraltar insists that, however all this may seem to us, we must follow the contrary finding of the referee, affirmed by the district court, unless we are prepared to brand this as "clearly erroneous." See

In re Slocum, 22 F.2d 282, 285–286 (2 Cir. 1927); In re Melnick, 360 F.2d 918 (2 Cir. 1966). There are indeed a multitude of opinions proclaiming, in one way or another, the applicability of the "unless clearly erroneous" rule, see F.R. Civ.P. 52(a), to decisions of a referee or district judge that a creditor did or did not have reasonable cause to believe his debtor was insolvent. See, e. g., McDougal v. Central Union Conference Ass'n, 110 F.2d 939, 942 (10 Cir. 1940); Harrison v. Merchants Nat. Bank, 124 F.2d 871, 874 (8 Cir. 1942); Bostian v. Levich, 134 F.2d 284, 286–287 (8 Cir. 1943); Security-First Nat. Bank of Los Angeles v. Quittner, 176 F.2d 997, 999 (9 Cir. 1949); Norberg v. Ryan, 193 F.2d 407, 409 (9 Cir. 1951). It is not difficult, however, to assemble an equally impressive list of cases from this and the Fifth Circuit in which courts of appeals have reversed determinations as to reasonable cause without obeisance to the "unless clearly erroneous" principle. Levy v. Weinberg & Holman, Inc., supra, 20 F.2d 565; Pender v. Chatham Phenix Nat. Bank & Trust Co., supra, 58 F.2d 968; Marks v. Goodyear Rubber Sundries Co., 238 F.2d 533, 62 A.L.R.2d 770 (2 Cir. 1956); Mayo v. Pioneer Bank & Trust Co., 297 F.2d 392, 395 (5 Cir. 1961); Clower v. First State Bank, 343 F.2d 808 (5 Cir. 1965). Such seeming and largely unexplained [3] contrariety of decision suggests the need for further analysis.

▮▮ Determination whether a creditor had reasonable cause to believe his debtor was insolvent is a two-step process. First the court must determine what the creditor knew; then it must apply the rules as to the legal consequences of what he knew. The first step is indeed a question of fact. A typical illustration is resolving a conflict in testimony, as when a bankrupt insists that he told the creditor he was being forced to close down and the creditor denies it; another is determining the creditor's

3. Judge Wisdom's opinion in the *Mayo* case, which does confront the problem, arrives at a solution not basically different from ours.

knowledge by a factual inference, as when a bankrupt's poor financial condition has been bruited about in the trade, the creditor denies having heard of it, but his conduct, e. g., in pressing for more than usual security, suggests that he had. Both the resolution of conflicting testimony and the drawing of factual inferences from circumstantial evidence are protected by the "unless clearly erroneous" rule. See C. I. R. v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). At the opposite end of the spectrum, the courts, in developing glosses on the statute relating to the duty of inquiry and the nature of the inquiry demanded, have been pursuing their usual function of interstitial law making. An appellate court would not hesitate to reverse a referee or district judge who refused to find reasonable cause to believe in insolvency because he openly insisted on reading § 60b as limited to knowledge the creditor actually had rather than knowledge he ought to have had. The case should not stand differently as to review when a referee or judge, while not in terms disputing the relevant legal rules, has reached a result not truly consistent with them.

■ Whether application of a legal standard to facts that are undisputed or have been found without clear error is a question of law or of fact is, as we said in Ellerman Lines, Ltd. v. The S. S. President Harding, 288 F.2d 288, 292, (2 Cir. 1961), "[a]n area over which 'law' and 'fact' have battled for a century." See also N L R B v. Marcus Trucking Co., 286 F.2d 583, 590 (2 Cir. 1961). Perhaps clarity of thought would be promoted by recognizing that it is not exactly one or the other. Jural concepts are not limited to binary systems. The scope of review might be better understood by recognizing that the imperatives of F.R. Civ.P. 52(a) and its analogues are avoided whenever the issue is not one of "fact"; there is no necessity for going further and endeavoring to establish that it is one of "law" in the usual meaning of that term. Once this is understood, appellate courts can formulate such standards of review, subject, of course, to governing legislation, as comport with good sense and institutional allocations of power. This is why the degree of appellate abnegation toward the application of law to fact differs according to the identity of the fact finder, ranging from the jury, through the administrative agency, see N L R B v. Marcus Trucking Co., supra, 286 F.2d at 590–592, to another judicial officer. In the last case the institutional considerations operate within a single discipline and, as we have recently noted, there are substantial reasons, particularly relating to consistency of decision, that dictate rather full review. Mamiye Bros. v. Barber S.S. Lines, Inc., 360 F.2d 774, 778 (2 Cir. 1966). To be sure, an appellate court must respect findings of the trial judge as to what in fact happened and in addition should give due weight to his superior opportunity to acquire the true feel of the case, cf. Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 216, 67 S.Ct. 752, 91 L.Ed. 849 (1947). But when the issue is his application of a legal standard to facts undisputed or reasonably found, reversal is not limited to results that are "clearly erroneous"; it is enough that the appellate court should be convinced, as we are here, that the result does not jibe with the applicable rule of law.[4]

Almost all the cases cited above in which appellate courts have deferred to findings of a referee or judge with respect to reasonable cause to believe in a debtor's insolvency are reconcilable with this approach; the reviewing court, in invoking the "unless clearly erroneous" rule, has simply paid proper respect to

---

4. Although reversal in such a case could often be deemed justified under the principle that the "unless clearly erroneous" rule does not protect when the reviewing court has "the definite and firm conviction that a mistake has been committed," United States v. United States Gypsum Co., 333 U.S. 364, 394–395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), clarity is promoted by recognizing that the application of a legal standard to the facts is not a "finding of fact" within the rule.

the trier's determination of credibility or resolution of evidential conflicts. See also Coder v. Arts, 152 F. 943, 946, 15 L.R.A., N.S., 372 (8 Cir. 1907), aff'd, 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772 (1909), quoted with approval in Brookheim v. Greenbaum, 225 F. 763, 764 (2 Cir. 1915). The single exception is Security-First Nat. Bank of Los Angeles v. Quittner, supra, in which Judge Pope declared that "even where there is no doubt or controversy as to what facts came to the attention of the creditor, the question as to whether he acted reasonably in making no further inquiries, in short, whether he had reasonable cause to believe the debtor insolvent, is generally a question of fact." 176 F.2d at 999. Such a broad holding, though deriving some support from two of the older circuit court decisions cited,[5] did not take account of the authority in the courts of appeals looking the other way; and the Supreme Court pronouncement relied upon, Grand Trunk Ry. of Canada v. Ives, 144 U.S. 408, 417, 12 S.Ct. 679, 36 L.Ed. 485 (1892), dealt with what, for reasons indicated, we regard as the quite different question of the respect owed to a jury's application of law to fact. The Security-First Nat. Bank holding is indeed consistent with the Ninth Circuit's general view that a judge's decision on the issue of reasonable care is a finding of fact protected by the "unless clearly erroneous" rule, see Pacific Tow Boat Co. v. States Marine Corp., 276 F.2d 745, 752 & n. 12 (9 Cir. 1960), and cases cited. But we have adhered to our long held contrary position in face of that court's disapproval, see Romero v. Garcia & Diaz, Inc., 286 F.2d 347, 355–356 (2 Cir.), cert. denied, 365 U.S. 869, 81 S.Ct. 905, 5 L.Ed.2d 860 (1961), and Ellerman Lines, Ltd. v. The S. S. President Harding, 288 F.2d 288, 291–292 (1961), and have reaffirmed our view

as recently as Mamiye Bros. v. Barber S. S. Lines, Inc., supra.

A further reason for not regarding ourselves as bound by the referee's finding in this case is that it was infected by a misreading of the record. Apparently irked at what he deemed an effort by the trustee's counsel to put more into Hurwitz' mouth than Hurwitz had said, the referee ended up by putting in considerably less. After reciting testimony by a bookkeeper that sometimes a customer would be billed immediately on order and without awaiting delivery and that this constituted "pre-billing," the referee stated:

"The record is replete with insistence by Hurwitz both in his testimony before me and in his 21a examination transcripts in evidence that Wohl informed him that the Avrec account was a pre-billed account, that Avrec was a regular customer with which Hygrade had dealt and was still dealing with, that this was the only one to Hurwitz's knowledge on November 26, 1962, although after November 26, 1962 Wohl told him about other pre-billed accounts."

But the record is utterly clear that on November 26 Wohl told Hurwitz that Avrick was not the only pre-billed account and that he used the term to refer not to the rather bland practice described by the bookkeeper but to a writing up of accounts in the mere expectation of future orders.[6] Since the quoted finding of fact was thus clearly erroneous, the conclusion the referee drew from it can stand no better.

The order is reversed and the cause remanded so that the referee may make further findings and conclusions on the issues, reserved by him, whether the transfer was for or on account of an antecedent debt, § 60a(1), and whether, if

5. Boston Nat. Bank v. Early, 17 F.2d 691 (1 Cir. 1927); In re Eggert, 102 F. 735 (7 Cir. 1900).

6. The latter conclusion is compelled by Hurwitz' testimony repeatedly characterizing Wohl's pre-billing as "fraudu-

lent" and "not bona fide," as contrasted with his acknowledgment that in a hold-for-shipping order the fact that the goods are held by the seller "does not mean it is not a bona fide invoice."

the transfer was preferential, Gibraltar is entitled to a set off under § 60c. He may also consider the claim, first advanced in Gibraltar's petition for rehearing, that the trustee is not entitled to recover because the insurance policy was exempt property under New York Insurance Law § 166(1) if that point remains relevant in the light of his other findings and conclusions.

William Harold Cox, District Judge, dissented.