**S. E. STEIN, Trustee in Bankruptcy of the Estate of Seaway Floor and Paving Company, Inc., Plaintiff,**

**v.**

**RAND CONSTRUCTION COMPANY, INC., Defendant.**

**No. 70 Civ. 715.**

United States District Court, S. D. New York.

March 28, 1975.

Selker, Einbund, Rubenstein & Mosher, Cleveland, Ohio by Eugene I. Selker, Cleveland, Ohio, of counsel, Grunewald,

Turk, Gillen & Ford, New York City by Norman Turk, New York City, of counsel, for plaintiff.

Ralph Heyman, Brooklyn, N. Y., for defendant.

## MEMORANDUM

KEVIN THOMAS DUFFY, District Judge.

This is an action brought under Section 60 of the Bankruptcy Act, 11 U.S.C. § 96, to avoid an alleged preference. Plaintiff is the trustee in bankruptcy of the Estate of Seaway Floor and Paving Company, Inc. (hereinafter "Seaway"), which was a sub-contractor of defendant Rand Construction Company, Inc. (hereinafter "Rand").

On December 21, 1966 Rand was awarded a contract for the erection of certain buildings and facilities for a training school for boys at Skillman, New Jersey. Most of the work was sub-contracted by Rand. Apparently, at the time that Rand obtained the original contract from the State of New Jersey, Seaway contacted Rand in an attempt to obtain the concrete sub-contract. A set of plans and specifications was sent by Rand to Seaway and Seaway, in turn, sent a letter listing references, including three banks and various companies for which it had done work. Since Seaway was based in Cleveland, Ohio, Rand apparently had no knowledge whatsoever of its background or financial status. The officials of Rand, however, were apparently impressed by the technical knowledge of the president of Seaway and because there was an "affirmative action program" required by the State of New Jersey, Rand decided to let the concrete sub-contract to the "minority-owned" Seaway.

As was its usual course of business, Rand had prepared a form sub-contract which included a requirement for a performance bond. The officials of Seaway, however, objected to this requirement, stating that they had so many jobs going at the same time that they had reached a point where they could no longer obtain such a bond. Those representing Rand then requested that Seaway post with their attorney $25,000, with the thought that this would obviate the necessity for a performance bond. In turn, the officers of Seaway suggested that they put in escrow a $25,000 certificate of deposit from a bank whereby Seaway would be able to draw the interest from the money without permitting it to lay fallow. Rand agreed.

An agreement was entered into simultaneously with the sub-contract, whereby an attorney from New Jersey was to hold the certificate of deposit, in lieu of the ordinary surety bond. Seaway thereupon started the performance of its duties under the sub-contract.

At some point, in the Fall of 1966, Seaway engaged a C. P. A, who testified at trial. The accountant indicated that the books and records which he then had were totally inadequate and had to be reconstructed by him. He further indicated that at that time the financial condition of Seaway was "disastrous", a situation which continued until the bankruptcy petition.

Prior to the entry of the sub-contract, Rand had not requested any financial statement from Seaway, but rather, relied upon a statement that Seaway was owed large sums from White & Green, which was a major general contractor. As the job progressed, Seaway did not meet certain of its bills. Payments under the sub-contract were billed on a monthly basis, which bills were then submitted to the State of New Jersey, and Rand received its monies and those for the sub-contractors some six weeks after the work was actually done.

On July 28, 1967, Rand sent a letter to Seaway requesting a "sub-contractor's affidavit, waivers of liens by Seaway's main suppliers and forms showing that certain taxes and withholding taxes had been deposited with the Federal depositories." The requested affidavit and exhibits were never produced. But at

some point in August 1967, Seaway advised Rand that it was encountering "cash flow" problems and thereafter requested Rand to advance payments for partially completed work, so that on a bi-weekly basis it could meet its payroll at the job site.

Certain of the material men used by Seaway also insisted that Rand guarantee payments to them of the items which they delivered to the job site for installation by Seaway. At the request of one of the officers of Seaway checks were made payable to Seaway and to these material men jointly. It appears that this situation is not uncommon in the construction industry since the general contractor often wishes to make sure that liens are not posted against the job.

On October 28, 1967, Seaway had become indebted to Rand for payments for a substantial amount of material and the officers of Rand suggested that the $25,000 certificate of deposit be redeemed and payment be made to Rand from this money. The assignment was made and the escrow agent turned over the monies on October 31, 1967. It is important to note that the escrow of the certificate of deposit was such that it was not assigned formally to the Rand Corporation until October 28, 1967. Thereafter, starting on November 2, 1967, Rand was notified that Seaway was in default of its obligations to certain of the unions representing Seaway's employees. The amounts of these obligations were relatively small and apparently Rand advanced the funds to Seaway for the required payments to the unions.

Seaway continued doing the concrete work on the job site until at least January 11, 1968. Between the assignment of the certificate of deposit on October 28, 1967 and January 11, 1968, Rand paid to Seaway direct payments of at least $15,606.61 and payments to the joint order of Seaway and its material men of at least $48,253.85.

Seaway filed for voluntary bankruptcy on February 29, 1968, admittedly within the four month period after the transfer of the certificate of deposit from Seaway to the defendant Rand, particularly since payment of the monies was not received by Rand until November 2 or 3, 1967. It was further stipulated that if a voidable preference be found by this Court that Rand could be considered as receiving a greater percentage of its debts from Seaway than other creditors of the same class.*

Section 60(a)(1) of the Bankruptcy Act, 11 U.S.C. § 96(a)(1), provides:

"A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

But Section 60(b) of the Bankruptcy Act, 11 U.S.C. § 96(b), also provides in pertinent part:

"Any such preference may be avoided by the trustee *if the creditor* receiving it or to be benefited thereby or his agent acting with reference thereto has *at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent."* (Emphasis added)

Recognizing that the above sections of the Bankruptcy Act are controlling, this case presents two issues: first, did Rand have a security interest perfected by possession prior to the four month statutory period; and second, did Rand have reasonable cause to believe that Seaway was insolvent at the time the transfer was made.

As to the first issue presented, § 3–104 of the New Jersey Uniform Com-

---

* After Seaway abandoned the job, Rand, even with offsets, paid $28,000 more than as

sub-contracted to Seaway to complete the job.

mercial Code (hereinafter "UCC") classifies a certificate of deposit as a "negotiable instrument." 12A N.J.Stat.Ann. § 12A:3–104. With limited exceptions not relevant to this case, a security interest in a "negotiable instrument" can be perfected only by the secured party's taking possession of the instrument. UCC § 9–304; 12A N.J.Stat.Ann. § 12A:9–304.

■ Rand argues that it received possession of the instrument when Seaway delivered the instrument to George Bohlinger, Jr., an attorney, pursuant to the April 7, 1967 escrow agreement. The UCC recognizes that possession may be by the secured party himself or by an agent on his behalf, UCC § 9–305, Official Comment 2; 12A N.J.Stat.Ann. § 12A:9–305. However, on the facts of this case I find that Bohlinger was not the "agent" of Rand for the purpose of accepting possession of the certificate of deposit. Indeed, during the relevant time period the interest from the certificate of deposit was paid to Seaway rather than to Rand, a fact inconsistent with Rand's position that it had the requisite "possession" of the certificate of deposit. In arguing that Bohlinger was its agent Rand points to the fact that he was the attorney to whom Rand generally referred its legal matters. However, this argument is considerably weakened by the fact that Bohlinger also did some legal work for Seaway.

■ Finally, deeming Bohlinger, the escrow holder, to be an agent of any one party to the escrow agreement appears to be inherently inconsistent with the nature of an escrow agreement. As the Court said in In re Dolly Madison Industries, Inc., 351 F.Supp. 1038 (E.D. Pa.1972), aff'd, 480 F.2d 917 (3d Cir. 1973):

"Fundamental to the existence of an escrow is the transfer of the escrow instrument into the hands of a third party as depository. Prior to the happening of any of the conditions upon which the escrow agreement operates, the escrow agent is not empowered to act for either party. Although he may be an agent for one of the parties in other respects, with respect to the instrument in escrow his powers are solely limited to those stipulated in the escrow agreement."

Id. at 1042 (emphasis added).

■ Thus, the delivery of the certificate of deposit to Bolinger, the alleged escrow agent, was not delivery to Rand and Rand did not perfect a security interest by possession prior to the four month statutory period.

The second issue raises the question of whether Rand had reasonable cause to believe that Seaway was insolvent at the time the transfer was made. Rand argues that because of the peculiar conditions of the construction industry it could not have "reasonable cause to believe that [Seaway was] insolvent" at the time the transfer was made.

■ I must hold otherwise. The debtor's non-payment of bills, its calls for advances to meet payroll, its refusal to supply the normal sub-contractor's affidavits, the demand of material men for a guarantee, etc., constitute "reasonable cause that [it] was insolvent."

■ As Judge Friendly has said: "A preference is clearly voidable under § 60b 'when such a state of facts is brought to the creditor's notice, respecting the affairs and pecuniary condition of the debtor, as would lead a prudent business person to the conclusion that the debter is insolvent,' 3 Collier, Bankruptcy ¶ 60.53, at 1057–58 (14th ed. 1964). The statute moreover has been properly read as going somewhat beyond this to preclude a creditor from deliberately closing his eyes so as to remain in ignorance of the debtor's condition; 'where circumstances are such as would incite a man of ordinary prudence to make inquiry, the creditor is chargeable with notice of all facts which a reasonable diligent inquiry would have disclosed'

and 'an inquiry of the debtor alone is generally insufficient.'

Id. at 1063–65.''

In re *Hygrade Envelope Corp. (Baranow v. Gibraltar Factors Corp.),* 366 F. 2d 584, 586–87 (2d Cir. 1966). I find that in this situation Rand either knew that Seaway was insolvent or deliberately closed its eyes to remain in ignorance.

In conclusion, I find that the transfer of the funds to Rand constituted a voidable preference under § 60(a) and (b) of the Bankruptcy Act, 11 U.S.C. § 96(a) and (b).

Settle judgment on notice.