**In re NATIONAL MERRITT, INC., Bankrupt.**

**Robert M. FISHER, Trustee in Bankruptcy of National Merritt, Inc., Plaintiff,**

v.

**AZTEC MARKETING CORP., Defendant.**

**Bankruptcy No. 74–B–1376.**

United States Bankruptcy Court, S. D. New York.

May 20, 1981.

Robert P. Herzog, New York City, for plaintiff; Stephen L. Morris, New York City, of counsel.

Carl S. Young, New York City, for defendant; Edward J. Cohen, New York City, of counsel.

## OPINION

ROY BABITT, Bankruptcy Judge:

On the appeal from this court's order of January 30, 1979, dismissing the trustee's

complaint to recover a preferential transfer,[1] Section 60 of the now repealed 1898 Bankruptcy Act, 11 U.S.C. (1976 ed.) § 96,[2] District Judge Conner remanded so that this court could receive evidence on the factual issue of whether the defendant-transferee, here, Aztec Marketing Corp. (Aztec) had reasonable cause to believe the debtor-transferor, National Merritt, Inc. (Merritt), was insolvent at the time of the transfer within the meaning of Section 60(b) of the Bankruptcy Act, 11 U.S.C. (1976 ed.) § 96(b), the trustee's enforcing provision to avoid a Section 60(a) preferential transfer.[3]

On October 3, 1974, Merritt filed its petition for an arrangement under Section 322 of Chapter XI of the Bankruptcy Act, 11 U.S.C. (1976 ed.) § 722. The Chapter XI aborted on May 4, 1977 and bankruptcy administration followed. Robert M. Fisher, plaintiff herein, became the trustee, and as plaintiff, commenced this adversary proceeding, pursuant to Part VII of the Bankruptcy Rules, 411 U.S. 1068, 93 S.Ct. 3147, 37 L.Ed.2d lxvi, et seq., by filing a complaint, Rule 703. This complaint alleged that on August 8, 1974, within four months of the Chapter XI petition, and while the debtor was insolvent, Martin Sperling, Inc. (now Aztec Marketing Corp.) recorded a promissory note and mortgage deed with the town clerk in Stamford, Connecticut,[4] to secure an antecedent debt, a $200,000. loan made to the debtor in March, 1970 by Sperling. The complaint goes on to allege that the effect of this transfer enabled Aztec to obtain a greater percentage of its debt than some other creditor of the same class, and, as it had reasonable cause to believe Merritt was insolvent, this mortgage constituted a voidable preference under Section 60. The trustee sought a judgment declaring this transfer a nullity. Aztec answered, denying each element in the complaint, other than the filing of the mortgage deed on August 8, 1974.

■ The District Court, on review of the trial record, and its appraisal of the applicable law, ruled that all elements of a preference were satisfied on the record as it then stood. The only issue remaining and the subject of this remand is whether, at the time of the transfer,[5] August 8, 1974, Aztec

---

1. At the initial trial, this court dismissed the preference count at the conclusion of the trustee's case, with prejudice. As indicated by memorandum endorsement on the back of the amended complaint, this dismissal was for failure to prove the element described by Section 60(b) of the Act.

   The second count of the complaint, seeking reformation of the mortgage instrument, was also dismissed, though without prejudice.

   The trustee appealed both dismissals. Rule 801, 411 U.S. 1086, 93 S.Ct. 3161, 37 L.Ed.2d lxxiii. Both dismissals were reversed by the District Judge, and remanded for further consideration by this court. Pursuant to this remand, at the trial, counsel for plaintiff-trustee discontinued the second count with prejudice, leaving this court with only the preference count. [Transcript at 123]

2. As this petition was filed before the effective repeal of the 1898 Act, its provisions continue to control this dispute. See Title IV of the 1978 bankruptcy reform legislation. Pub.L. No. 95–598, 92 Stat. 2549, 2683. All citations, unless otherwise indicated, are to the 1898 Bankruptcy Act and the 1976 edition of the United States Code.

3. It was long acknowledged that this issue of "reasonable cause to believe" was a difficult one to resolve, varying with the peculiar facts of each case. The requirement that the trustee prove the state of mind of his opponent proved often to be insurmountable. See 3/Part 2 *Collier on Bankruptcy* (14th ed.) ¶ 60.53[2]. The new Bankruptcy Code, 11 U.S.C. § 547(f), creates a presumption of insolvency within the preference period, requiring the party against whom the preference exists to come forward with evidence to rebut it. See H.R. Report No. 595, 95th Cong., 1st Sess. 178 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 6 (1978) U.S. Code Cong. & Admin. News 5787; see generally 4 *Collier on Bankruptcy* (15th ed.) ¶ 547.03.

4. There is no dispute that among the assets of the bankrupt, there is a parcel of real property located in Stamford, Connecticut, which was leased as a gasoline station. In connection with a proposed sale by the trustee, a title search was conducted which disclosed the fact of the August 8, 1974 recordation.

5. Section 1(30), 11 U.S.C. (1976 ed.) § 1(30), defines a "transfer" to include "every . . . mode, direct or indirect . . . of fixing a lien upon property or upon an interest therein . . . ." The parties agree that the recording of the mortgage on August 8, 1974, approximately 4½ years from its execution, constituted a

had reasonable cause to believe the bankrupt was insolvent. The ultimate burden of persuasion on this issue rests with the trustee, for without sufficient proof as to the elements of Section 60(a) and (b), this action fails.

The testimony presented at the trial on the remand unfolds a scenario from which it is found that Aztec possessed crystal clear knowledge of the precarious financial condition of the debtor; and, what is more, acted upon this knowledge with alacrity to protect its interest. The court's inquiry must initially begin with the facts actually known to Aztec, the transferee, for it is from these that it determined that Aztec's knowledge gave rise to reasonable cause for it to believe that the debtor was insolvent. *Hygrade Envelope Corp. v. Gibraltar Factors Corp.*, 366 F.2d 584 (2d Cir. 1966).

■ David Ratner, sole stockholder and an officer of Aztec, and his father, Leo Ratner, president of Aztec at the time of the August 8, 1974 recordation, testified, not surprisingly, that their ultimate assessment of Aztec's knowledge was that it lacked actual knowledge of the precise financial condition of the debtor. Actual knowledge, however, is not the controlling standard, for all that is required is reasonable cause to believe. 3/Part 2 *Collier on Bankruptcy* (14th ed.) ¶ 60.53[1]. "It is the cause to believe and not the belief itself that is determinative and proof of actual knowledge of insolvency is not necessary". *In re O'Neill Enterprises, Inc.*, 359 F.Supp. 940 (W.D.Va.1973). It ·is for the court to make a determination of the particular facts known, and to draw all inferences reasonably to be drawn from the *mise-en-scene*. Prior cases in this Circuit, determinative on general principles of law alone, teach that the proper standard is that if known facts and circumstances regarding the debtor's condition are such as would put an ordinary prudent business person upon inquiry, the transferee is chargeable with

knowledge of the facts that such inquiry would disclose. *Kravetz v. Joange Building Corp.*, 341 F.2d 561 (2d Cir. 1965); *Robinson v. Commercial Bank of North America*, 320 F.2d 106 (2d Cir. 1963); *Hygrade Envelope Corp. v. Gibraltar Factors Corp., supra.*

■ The evidence presents the picture of two companies with numerous ongoing business relationships. The initial $200,000. loan, of which $90,000. is outstanding today, secured by the mortgage on the Stamford property, was arranged by Samuel Greenberg, an attorney representing both sides of the transaction.[6] Aztec remained as a client of his firm through 1972. The use of the same attorney tends to indicate the existence of mutual understanding and trust, the existence of which fosters an inference that the transferee has information concerning sufficient facts to make a preference voidable. 3/Part 2 *Collier on Bankruptcy* (14th ed.) ¶ 60.54[1]. Aztec was also involved in a business headed by an accountant for Merritt. This close relationship certainly supports the reasonable inference that the motivation for refraining from recording the note and mortgage was to create a false picture of financial strength for the debtor, a deceptive presentation conducive to further extensions of credit to the debtor by others. A bankruptcy court should not lightly put its seal of benediction on a scheme to ambush a debtor's unsuspecting creditors.

It is undisputed that Merritt was delinquent in paying the Stamford loan from its inception. It was consistently late with payments forcing Aztec into a pattern of telephonic dunning in order to coerce payment. By the end of 1971, Merritt was six months behind in its interest payments alone.[7] Aztec was also aware that Merritt was operating with a very tight cash flow.[8] By mid–1974, the telephone calls no longer resulted in payment and forced David Ratner to travel to Merritt's Connecticut office to demand compliance. After strong words,

---

transfer as of that date within the meaning of that section.

**6.** Transcript at 55.

**7.** Transcript at 59, 80–82.

**8.** Transcript at 60, 69.

Ratner left with two post-dated checks for overdue principle payments. When the time came for these checks to be deposited, Merritt called to ask that more time be given.[9]

In 1974, it appears Aztec became so disquieted with the original promissory note that it felt compelled to structure a new arrangement to "clarify" the prior one. As a result, personal guarantees were obtained from the Merritt partners, and a heightened interest charge was agreed to. This note, dated January 1, 1974, was in the amount of $90,000. It was due in six months—July 1, 1974. These facts certainly bolster the conclusion that Aztec not only inquired into Merritt's financial condition, but, armed with knowledge of its parlous nature, it also acted to protect its investment.[10] Each of these factors alone might not support a finding of reasonable cause to believe a debtor's insolvency, 3/Part 2 *Collier on Bankruptcy, supra,* ¶ 60.54, but their combination makes a weighty case. Clearly the events called for due diligence which should have impelled Aztec to make inquiry into Merritt's financial well being. Given all these facts, indisputably known to Aztec, the conclusion that a prudent man would have believed the debtor was unable to meet its obligations becomes irresistible.

Indeed, this court need not rest its finding solely on the above recited facts, for the Stamford loan was not the only encounter Aztec had with Merritt. From 1970, Aztec held a thirty percent interest in Laurel Loan, a finance company, in which Bob Schulman, then accountant for Merritt, held a majority interest. In 1973, Schulman structured a $300,000. loan to Merritt, wherein Aztec, acting as record lender, served as a conduit through which the funds passed from Laurel to Aztec. Schulman felt this arrangement would insulate him from having to press Merritt for payment.[11] Consistent with the above-mentioned pattern, this loan also fell into arrears, compelling Aztec to importune payment.[12] However, Merritt's performance under this agreement was so poor that Aztec, by Leo Ratner, then president, as directed by Laurel, was compelled to commence a lawsuit on July 25, 1975 against Merritt, to recover $90,000.[13]

The commencement of that action was the subject of an August 5, 1974 meeting, convened to review the financial condition of Merritt.[14] Leo Ratner, then president of Aztec, attended this meeting at Schulman's insistence, as he rather narrowly viewed it, solely to police Laurel Loan's interest. Also present were Norman Friedman, president of Merritt, Laurel Loan's attorney, and Merritt's attorney. At this meeting, Merritt requested further time from Aztec to enable it to meet its obligations. According to Leo Ratner, the purpose of the meeting was to:

> "A.   ... I guess perhaps it [the lawsuit] had something to do with it, that they wanted us to go easy with it and give National Merritt time to meet their obligation.
>
> Q.   At that meeting was there any discussion with respect to the assets of National Merritt?
>
> A.   Well, not exactly, except that Norman Friedman passed certain remarks if he is given more time he will eventually pull out of this." Transcript at 104.

While it seems clear that this would indicate to a reasonable businessman that things were amiss with Merritt, Leo Ratner insisted otherwise for, he testified, he asked no questions and in no way actively participated at this session.[15] He singlemindedly persisted in viewing his role as a Laurel representative, divorced from his legitimate concerns about Aztec's own outstanding

9. Transcript at 58, 83.

10. Transcript at 84–86.

11. Transcript at 71–83.

12. Transcript at 80.

13. Transcript at 88–91.

14. Transcript at 102.

15. Transcript at 107, 110–112.

loan. How Ratner can be believed, considering his own knowledge that an action was pending against Merritt and the outstanding amount owed on the Stamford loan, defies rational explanation. Indeed, Ratner's apathy becomes even more peculiar when viewed against the interest he should have had in at least protecting Aztec's 30% interest in Laurel Loan.

In the usual case involving an unperfected transfer it is probable that the transferee is maintaining a close check on his debtor's condition. The fact of perfection after a long delay on the eve of a bankruptcy petition fosters a strong inference that the transferee did, in fact, maintain such surveillance.

Notwithstanding his insistence otherwise, the next day Leo Ratner called his son to tell him what had transpired at the meeting. Whatever this information was, it propelled a flurry of activity on Aztec's part on the subsequent business day, activity indicative of inordinate concern over the status of the Stamford loan. On August 8, David Ratner's wife went to their vault to retrieve the mortgage deed and brought it to their attorney. According to the testimony, it was only then that Aztec first learned the instrument was not properly recorded.[16] Not surprisingly, this was rectified by Mrs. Ratner who on that same day drove to Connecticut to record the mortgage deed.[17]

The only reasonable inference to be drawn from this activity was that Aztec was fully aware of Merritt's precarious financial condition, and, on August 8, acted upon its knowledge to protect its position. Any trier of the fact would be surprised if such a lender would not suspect his debtor was anything but in trouble based upon this record. This court must not only determine what the creditor knew, but also what he ought to have known. Here, the court has testimony undeniably establishing that Aztec was at least on notice of sufficient facts to paint a clear picture of Merritt's deteriorating ability to pay its debts. Any businessman, faced with these facts, would feel compelled to start looking into this increasingly threatening situation. Leo Ratner, 50 years in a meat packing business generating $5 million in sales surely did not lack that degree of business acumen necessary to protect Aztec's business interest.

Section 60(b), properly read, precludes a creditor from deliberately closing his eyes to profess ignorance of the debtor's condition. *In re Hygrade Envelope Corp., supra.* The only reasonable finding to be made from the evidence is that Aztec had reasonable cause to believe the debtor was insolvent within the meaning of Section 60(b) and those cases which have given it gloss.

The trustee is entitled to judgment. Settle an order.