**William C. SANDOZ, Trustee for Attaway Clinic and Hospital Trust**

v.

**Melva M. KNIPPERS.**

**William C. SANDOZ, Trustee for Attaway Clinic and Hospital Trust**

v.

**Curtis F. KNIPPERS.**

**William C. SANDOZ, Trustee for Attaway Clinic and Hospital Trust**

v.

**E. J. KNIPPERS.**

**William C. SANDOZ, Trustee for Attaway Clinic and Hospital Trust**

v.

**R. H. LEE.**

**William C. SANDOZ, Trustee for Attaway Clinic and Hospital Trust**

v.

**C. H. WILLIAMS.**

**William C. SANDOZ, Trustee for Attaway Clinic and Hospital Trust**

v.

**A. W. KNIPPERS.**

**William C. SANDOZ, Trustee for Attaway Clinic and Hospital Trust**

v.

**Norman KNIPPERS.**

Civ. A. Nos. 8452, 8453, 8458–8462.

United States District Court
W. D. Louisiana,
Shreveport Division.

April 30, 1965.

Richard B. Sadler, Jr., Provosty, Mc-Sween, Sadler & Scott, Alexandria, La., for plaintiff.

John S. Pickett, Jr., Thomas A. Self, Many, La., for defendants.

BEN C. DAWKINS, Jr., Chief Judge.

Dr. C. L. Attaway, Lillian Attaway and the Attaway Clinic and Hospital of Ville Platte, Louisiana, filed a voluntary petition in bankruptcy May 25, 1959, and plaintiff duly was appointed trustee. He seeks in these actions to recover on behalf of the trusteeship payments made to defendants May 21, 1959, which are alleged to be voidable preferences under Section 60 of the Bankruptcy Act (11 U.S.C.A. § 96).

Defendants were participants in what was called informally the "Attaway Investment Plan." Under this plan defendants gave a number of their checks to Dr. Attaway in the amounts of either $500 or $1,000, in return for which Attaway gave them his checks drawn on a bank in Ville Platte, Louisiana, for the same amounts. Defendants and Attaway orally agreed that defendants could cash the checks given them by Attaway at any time, but they were to receive "interest" payments of 5 per cent per month, or 60 per cent per annum, so long as they held his checks without cashing them. Defendants deposited their checks with Attaway and received his checks in return at various times between November 19, 1958, and April 7, 1959. They received regular monthly checks amounting to 5 per cent of their "investment" until they cashed their checks at the bank in Ville Platte May 21, 1959.

Two principal issues are presented for decision: (1) whether at the time defendants cashed their checks May 21, 1959, they knew or had reasonable cause to believe that Dr. Attaway and his clinic were insolvent; and (2) whether the cashing of defendants' checks constituted payments "for or on account of an antecedent debt" within the meaning of Section 60, sub. a.

The Attaway Clinic and Hospital was a partnership composed of Dr. Attaway and his sister, Lillian. Dr. Attaway and the hospital drew patients from a large area in Louisiana and Texas, and gross receipts by the hospital for the fiscal year ending January 31, 1959, amounted to $656,390.83. The Attaway plan was handled through the financial books and records of the Attaway Clinic and Hospital.

Attaway first began a "check plan" sometime in 1957, and the type plan in which defendants participated was adopted in the early part of 1958. He had a highly persuasive personality, and apparently convinced defendants and other "investors" that the reason such large monthly "interest payments" could be made was that a tax loop-hole had been discovered whereby he could reduce greatly the amount of his taxes by paying this incredibly high rate of interest. When the bankruptcy petition was filed, approximately 2800 depositors from 32 states were participating in the Attaway plan. The total amount of checks deposited with Attaway at that time was over $5 million, and the total cash on deposit at the bank in Ville Platte was approximately $1 million. Despite this fact, during the first part of 1959, the amount of average monthly deposits in the Attaway plan increased over previous months. Obviously, he was negotiating more of his checks to meet the ever increasing "interest" payments falling due.

All of defendants' Attaway checks were cashed at the bank in Ville Platte May 21, 1959. On the previous night between midnight and 1 A.M. Norman Knippers was at his home in Many, Louisiana, when he received a phone call from W. A. Williams in Baton Rouge. Williams also was a depositor in the Attaway plan, and

he and Norman Knippers previously had agreed that if one of them cashed in his Attaway checks, he would notify the other. Williams told Norman Knippers by phone that he was going to cash his checks the following day, but both testified that no further explanation was given by Williams, a fact we find impossible to believe. Soon after 7 A.M., the following morning Norman Knippers called R. H. Lee, a friend and business competitor, and told him he was going to cash his Attaway checks that day. Lee immediately went home to get his checks and brought them to Norman Knippers to take to Ville Platte to cash.

Norman Knippers also saw his father, A. W. Knippers, who lived adjacent to him, about 7 A.M. and told him he was going to cash his checks. A. W. Knippers notified his daughter, Melva, and took her checks with him to cash. He and Norman Knippers then drove by the store owned by Curtis Knippers, a cousin of A. W. Knippers, and told him of their intentions. Curtis Knippers called his brother, E. J. Knippers, and told him of the plan to cash in, and E. J. brought his checks to Curtis to take to Ville Platte. Curtis, A. W. and Norman Knippers then drove to Ville Platte to cash all the checks.

When Williams called Norman Knippers after midnight, he also called Roy Cook in Florien, Louisiana, and told him of his intention to cash his checks. Cook tried to get Williams to give him his reasons for doing so, but Williams refused, according to his testimony. Again, we do not believe this. For some unexplained reason Roy Cook did not go to Ville Platte the next day to cash his checks.

Williams then called Marion Dover in Shreveport, Louisiana, and told him of his plan to cash in. Dover then called his brother and brother-in-law that same night and told them that he was leaving for Ville Platte at 4 A.M. the next morning to cash his checks. They both brought their checks to Dover about 4 A.M. Dover also called Charley Jett in Florien, Louisiana, that night and told

him to meet him at his office in Many at 6 A.M. the next morning, but said he did not tell Jett why. We do not believe this. When Jett met him next morning, he told Jett he was going to cash his checks, so Jett got his checks and accompanied Dover to Ville Platte to cash in. They got to the bank before it opened, and a young lady clerk let them in a side door to cash their checks.

As Dover and Jett were returning to Many, they met Norman, A. W. and Curtis Knippers in Oakdale, Louisiana, on their way to Ville Platte. They stopped and chatted awhile, but all maintain that nothing was mentioned about their reasons for cashing the checks, and no mention was made of any possible insolvency of Dr. Attaway and his clinic. This we cannot believe.

Lurking behind these mystery-shrouded circumstances were the activities of W. A. Williams and his connections with Attaway and some of his associates. Williams, originally from Many, was living in Baton Rouge where he was in process of organizing and selling shares of stock in a life insurance company. He and his father, defendant C. H. Williams, were both depositors in the Attaway plan. The circumstances leading up to Williams' midnight telephone conversations the night of May 20th grew out of his efforts to sell stock in his insurance company.

Attaway had formed an investment company and had hired a so-called financial expert, George Hamlin, to direct that company, and Robert Stateson was hired to locate and arrange for purchasing small insurance companies to be bought by the investment company. Stateson knew of Williams' insurance company and thought that company would be a good "vehicle" to use for acquisition of additional companies. For this purpose Stateson contacted Williams in Baton Rouge and inquired about the purchase of his insurance company.

In April, 1959, Attaway had hired his nephew, Joseph Bond, who is a Certified Public Accountant, to help him untangle his financial situation. Bond surveyed

the accounting records and recommended that Attaway go into a receivership or bankruptcy. May 17, 1959, Attaway consulted an attorney about the possibility of filing a bankruptcy petition. At that time no definite decision was made, and a further conference was arranged for May 19th. The second conference was attended by Attaway, his attorney, Bond and Stateson. Possible solutions to Attaway's financial condition were discussed, and the attorney recommended that an "umbrella of protection" be placed over the doctor's assets, but did not specifically mention bankruptcy.

The testimony is conflicting as to what was contemplated by these parties upon conclusion of this meeting. However, we think the more believable evidence shows that Stateson contemplated some type of reorganization outside the courts involving purchase and merger of several corporations into a holding company and an agreement among Attaway's creditors to accept stock in this company in return for their debts. Attaway's attorney, on the other hand, contemplated either bankrutpcy or an arrangement under bankruptcy court order.

Stateson arranged a meeting on May 20th at a motel in Baton Rouge among Williams, his attorney, Stateson and Attaway to discuss the purchase of Williams' insurance company. All but Attaway met at the motel at approximately 7:30 P.M. on May 20th and waited for Attaway. He never came to the motel, but sent word by Bond at 11:30 P.M. that he could not attend the meeting.

While Stateson, Williams and his attorney were waiting for Attaway, the doctor was in conference with his attorney and Bond discussing solutions to Attaway's financial plight. At this meeting they decided to proceed with a court ordered reorganization or arrangement rather than to follow Stateson's plan. Therefore, Attaway decided not to attend the meeting with Stateson and Williams to discuss the purchase of Williams' insurance company.

When Williams was informed at the motel that Attaway could not come, he was angry at having been "stood up" by the doctor. He and his attorney then went to a Baton Rouge hotel for coffee, and the attorney advised him to withdraw his investments in the Attaway plan. Although it was then past midnight, Williams then went to the hotel room of a friend, a member of the Louisiana legislature, and awakened him to tell him about his intention to cash his Attaway checks. Williams and his attorney then went to Williams' office where he made telephone calls to Norman Knippers, Marion Dover and Roy Cook, as well as other unidentified persons.

Williams left Baton Rouge at approximately 7:30 A.M., the next morning, May 21st, and drove to Ville Platte where he cashed his checks and those of his father, C. H. Williams. The evidence shows that Williams was authorized to act as his father's agent when he cashed his checks. Williams met Charley Jett and Marion Dover at the bank immediately after they had cashed their checks, before the bank was opened to the public.

May 21st 41 creditors cashed a total of 165 checks totaling $157,300.00. Of these 41 creditors thirteen persons were from the Many, Louisiana, area, and these thirteen creditors cashed 58 checks in the total amount of $45,500.00. Approximately 85% of the checks cashed on May 21st were presented at the bank in Ville Platte for payment, and the other 15% were sent through normal banking channels.

A spot check of the number of checks cashed and their amounts shows that between January 5, 1959, and May 21st, the largest number of checks cashed on any day prior to May 21st was 62 checks totaling $46,000 on May 13th. On May 15th no checks were cashed, and on May 20th eight checks were cashed totaling $4,000.

All defendants, Williams and Stateson claim they had no knowledge of Attaway's insolvency. Section 60, sub. b of the Bankruptcy Act (11 U.S.C.A. § 96, sub. b) permits the trustee to avoid a preference if the creditor receiving it has "reasonable cause to believe that the

debtor is insolvent." The legal standards applicable in such cases were set forth by the Fifth Circuit Court of Appeals in Mayo v. Pioneer Bank & Trust Co., 297 F.2d 392 (5 Cir. 1961):

"Cases on the point have evolved a fine line to apply in determining whether a creditor has 'reasonable cause to believe' that a debtor is insolvent. For reasonable cause to exist, it is not necessary that a person benefitted by a transfer know positively that the result of the transaction will be to effect a preference; it is sufficient for a finding of reasonable cause that the person or his agent has knowledge of such facts as would induce a person of reasonable prudence to make inquiry, when such inquiry would have developed the facts essential to a knowledge of the situation. On the other hand, if the known facts should raise only a suspicion that the debtor might be insolvent, the test is not met." 297 F.2d at 394–395.[1]

We think defendants had knowledge of facts that would have induced a person of reasonable prudence to make inquiry as to Attaway's solvency, and we think a reasonable inquiry would have revealed his insolvency.

Despite Stateson's protests to the contrary, we find the evidence to show that he knew Attaway and the hospital were insolvent. After his meeting with Attaway and his attorney on May 19th, we believe he certainly knew the dire plight of Attaway's financial situation.

We further find that the only reasonable explanation for the midnight telephone calls from Williams to his friends in the Many area, which resulted in their calling their friends and relatives and proceeding to the Ville Platte bank before it opened the next morning, is that in the meeting in the Baton Rouge motel the night of May 20th Williams definitely found out from Stateson that Attaway was insolvent. We further think the purpose of Williams' telephone conversations was to convey this information to his friends so they could cash their checks before it was too late. The only reasonable explanation for the actions of defendants and Marion Dover is their knowledge of Attaway's insolvency. That this information was passed from person to person in the Many area is the only reasonable explanation for thirteen persons from that area cashing 58 checks totaling $45,000 on May 21st. Therefore, we find that defendants had actual knowledge of Attaway's insolvency when they cashed his checks.

Even if defendants had not had actual knowledge of the insolvency, we think facts available to them would have induced a person of reasonable prudence to inquire as to the solvency of the Attaway plan. The incredibly high rate of interest (60 per cent per annum) should have been enough to warn any prudent person. A. W. Knippers had been told by his banker that the Attaway plan was a bad investment, and the Many bank refused to cash checks of depositors in the Attaway plan. It would take such checks only for collection.

R. H. Lee, in response to questions by the Court, stated that he had enough lack of faith in the Attaway plan that upon the first signal that someone was going to get out, he decided to cash his checks. Several other defendants admitted they knew they were taking quite a chance in this incredible investment. The fact that Norman Knippers and other members of the board of directors of Williams' insurance company had an agreement with Williams that he would tell them whenever he decided to cash his checks shows they knew the Attaway plan could not last long. The enormous interest rate would indicate that to any reasonably prudent person.

The most convincing evidence showing clearly that defendants had "reasonable cause to believe" Dr. Attaway was insolvent was their exceeding haste to go to Ville Platte in response to the calls from Williams. This alone showed they knew

1. See also Clower v. First State Bank of San Diego, Texas, 343 F.2d 808 (5 Cir. 1965).

this financial sand castle was about to crumble.

If defendants had made reasonable inquiry into the solvency of the Attaway plan, we think they easily could have discovered that Attaway was insolvent. Financial reports prepared by an auditor hired by Attaway showed he was insolvent at least as early as January 31, 1956, and he continued to be insolvent at all times until the filing of the petition in bankruptcy. Any of his depositors could have discovered this fact merely by demanding a financial statement of the Attaway plan. Instead, they all said they took his word that the plan was on solid financial footing.

■ Therefore, we find that defendants either knew of Attaway's insolvency as a result of the telephone calls from Williams, and the other facts within their knowledge, or they had information that would have caused reasonably prudent persons to inquire as to the insolvency of the Attaway plan, which inquiry would have disclosed it.

■ Defendants' second principal contention is that the cashing of their checks did not constitute payments "for or on account of an antecedent debt" within the meaning of Section 60, sub. a of the Bankruptcy Act. Counsel for defendant argues that no debt existed at all, and that the exchange of checks between defendants and Attaway were cash transactions. They contend that the 5% monthly payments were not interest payments, but were made out of the generosity of Attaway's heart. They rely on cases stating that payment relates back to the moment of receipt of the check,[2] and their counsel concludes that no antecedent debt existed, since payment of the checks on May 21st re-lated back to the date they were given to defendants.

We do not agree that this was a cash transaction. It has been said that any extension of credit, no matter how brief, establishes an antecedent debt within the provisions of the Bankruptcy Act. 8A C.J.S. Bankruptcy § 220(1) b at p. 101; see National City Bank of New York v. Hotchkiss, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913). The parties to these investments, Attaway and the depositors, entered credit agreements, and the checks signed by Attaway were evidences of such indebtedness. The effect of defendants' holding the Attaway checks was the same as if they had held his demand notes, and the 5% monthly payments were interest on the debts. There can be no question that payment of a demand note is payment upon an antecedent debt.

The relations among these parties were also the same as if Attaway had given them postdated checks. It has been held that payment of a postdated check constitutes a transfer of the debtor's property as of the time of payment, not the time of delivery of the check. Watchmaker v. Barnes, 259 F. 783 (1 Cir. 1919); In re Lyon, 121 F. 723 (2 Cir. 1903).

For these reasons we hold that the payments to defendants on May 21, 1959, fulfilled every element of a voidable preference under Section 60, and the trustee is entitled to recover these payments for the benefit of the bankrupt estate of the insolvent debtor. Therefore, defendants' motion for summary judgment is denied, and there will be judgment for plaintiff as prayed. Counsel for plaintiff should prepare and present a decree in accordance with this opinion.

---

2. See Ray v. Canal Bank & Trust Co., 186 La. 547, 173 So. 101 (1937); Richard v. Blair, 20 So.2d 577 (La.App.1st Cir. 1945).