**In re M.D.I., Inc., d/b/a Classic Catalog Showrooms, Debtor.**

**Jacob C. PONGETTI, Trustee for the Estate of M.D.I., Inc., d/b/a Classic Catalog Showrooms, Plaintiff,**

**v.**

**James A. SWEENEY, Defendant.**

Bankruptcy No. S82–10441.
Adv. No. 84–1225.

United States Bankruptcy Court,
N.D. Mississippi.

Oct. 27, 1986.

Jacob C. Pongetti, Columbus, Miss., for M.D.I., Inc.

T.H. Freeland, III, Freeland & Freeland, Oxford, Miss., for Sweeney.

OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

Came on to be heard and was heard the complaint to avoid preferential transfers filed by Jacob C. Pongetti, Trustee for the estate of M.D.I., Inc. d/b/a Classic Catalog Showrooms, hereinafter referred to as Trustee; answer and affirmative defenses filed by the Defendant, James A. Sweeney; all parties being represented by their respective attorneys of record; on proof and the presentation of documentary evidence in open court; and the Court having heard and considered same, hereby finds as follows, to-wit:

I.

This Court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157, as well as, the general orders

of reference entered by the United States District Court for the Northern District of Mississippi, dated July 27, 1984, and August 6, 1984. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(F).

All further references in this Opinion to United States Code sections shall be considered as Title 11, United States Code, unless specifically noted otherwise.

## II.

The text of 11 U.S.C. § 547(b), which is the basis of the Trustee's complaint in this case, is set forth as follows, to-wit:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Since this case was filed prior to the effective date of the Bankruptcy Amendments and Federal Judgeship Act of 1984, the text of § 547(b), set forth hereinabove, is that in effect at the time that this bankruptcy case was filed, rather than as it now appears after being amended, effective October 8, 1984.

## III.

The Defendant, James A. Sweeney, initially acknowledged that all of the elements of § 547(b) could be effectively established, including the fact that the Defendant was an insider, as that term was formerly defined under § 101(25) (now 11 U.S.C. § 101(28)), except for the following:

(a) The Defendant denied that the Debtor, M.D.I., Inc., d/b/a Classic Catalog Showrooms, hereinafter referred to as M.D.I., was insolvent when the transfers in question were made; and

(b) The Defendant denied that he had actual knowledge or reasonable cause to believe that M.D.I. was insolvent at the time of the transfers.

As a result of the M.D.I. financial statements, the corporate tax returns (all of which were introduced into evidence), and particularly the testimony of James Patterson, the certified public accountant employed by M.D.I., there is no doubt that M.D.I. was insolvent in December, 1981, and January, 1982, the pertinent times of the alleged preferential payments. As such, this issue is considered as resolved and will not be discussed further in this opinion.

The only issue that remains to be decided is whether the Defendant had actual knowledge or reasonable cause to believe that M.D.I. was insolvent at the time of the transfers. If he did, the transfers are voidable preferences.

## IV.

M.D.I. was incorporated in the State of Mississippi in July, 1977, and initially commenced its business activities in Tupelo, Mississippi, as a catalog showroom. J. Robert Sweeney, the son of the Defendant, and Russell B. Truell were the only stockholders of M.D.I., each owning a 50% interest in the corporation. They acquired their capital stock through an investment of $20,000.00 each. Shortly thereafter, Rus-

sell Truell's father, who was already in the catalog showroom business in Jackson, Tennessee, loaned M.D.I. the sum of $80,000.00 in the form of merchandise, evidenced by an unsecured promissory note. J. Robert Sweeney's father, the Defendant herein, made a cash loan to M.D.I. in the sum of $80,000.00, evidenced also by an unsecured promissory note. When M.D.I. opened a second store in Fort Smith, Arkansas, in August, 1980, both fathers again made unsecured loans to M.D.I., advancing the sums of $60,000.00 each.

M.D.I.'s business appeared to be doing well before the second store was opened in Forth Smith. This store experienced substantial losses, largely due to inadequate sales and exorbitant overhead costs. Concisely stated, the successful operations in Tupelo could not offset the staggering losses experienced in Forth Smith. The net result was the total financial collapse of both stores which occurred in late summer, early fall, 1982.

The financial statements and corporate tax returns, prepared for M.D.I., revealed the following pertinent information:

a. Effective December 31, 1980, assets, in the sum of $1,312,936.00, exceeded liabilities, in the sum of $1,267,923.00, by the sum of $45,013.00, which represented the stockholders' equity;

b. In 1980, M.D.I. experienced a tax loss in the sum of $81,748.00;

c. Effective December 31, 1980, the value of the common stock was reflected as a negative $204.37 per share;

d. Effective December 31, 1981, assets, in the sum of $1,334,760.00, were exceeded by liabilities, in the sum of $1,633,126.00, netting a deficit of $298,366.00; (This balance sheet deficit substantiates the conclusion of C.P.A. James Patterson that M.D.I. was insolvent as of December 31, 1981.)

e. In 1981, M.D.I. experienced a tax loss in the sum of $343,789.00;

f. Effective December 31, 1981, the value of common stock was reflected as a negative $858.45 per share.

This bankruptcy case was filed on October 7, 1982. At that time, the bankruptcy schedules, which were corroborated by the testimony of J. Robert Sweeney, reflected that M.D.I. held assets valued in the approximate sum of $571,131.00, while its liabilities were in the approximate sum of $1,308,020.59.

On October 6, 1981, J. Robert Sweeney acquired Russell Truell's interest in M.D.I. by the payment of the book value of Truell's stock in the sum of $22,506.00, as well as, by assuming personal liability on the two $80,000.00 notes and the two $60,000.00 notes owed to the Defendant and Truell's father.

J. Robert Sweeney, who served as president and as a member of the board of directors of M.D.I., handled the day to day operations of the business. According to the testimony, Sweeney was a very meticulous person; he was skilled in accounting, and saw that M.D.I. kept an up-to-date set of books and records. M.D.I. utilized an I.B.M. System 34 computer, which was located in Jackson, Tennessee, but had terminals in the Tupelo, Mississippi, store. Information could be "keyed in", and printouts obtained on a daily basis. Considering the evidence presented, this Court is of the opinion that J. Robert Sweeney was a well educated businessman who kept a watchful eye on the financial affairs of M.D.I.

The Defendant served as Secretary of M.D.I., as well as, a member of the corporate board of directors until he resigned on February 24, 1982. As such, he was a member of the board at the time of the transfers set forth in the trustee's complaint. Although he was retired at the time of this trial, the Defendant had experienced a successful banking career spanning over 37 years. By his own testimony, he was a knowledgable, conservative businessman, having a comprehensive knowledge of financial books and records.

On December 24, 1981, M.D.I., acting through J. Robert Sweeney, paid to the Defendant the sum of $60,000.00, representing the principal balance owed on the second promissory note and on January 1,

1982, paid to the Defendant the sums of $6,400.00 and $4,800.00, representing interest accrued on both notes. Therefore, the total sum of $71,200.00 was paid to the Defendant, an admitted insider to M.D.I., between 90 days and one year before the filing of M.D.I.'s voluntary bankruptcy petition. The trustee seeks to set aside these payments as preferential transfers pursuant to § 547(b), which was set forth hereinabove.

### V.

Had this bankruptcy case been filed subsequent to the effective date of the Bankruptcy Amendments and Federal Judgeship Act of 1984, i.e., October 8, 1984, there would be nothing for this Court to decide. Revised § 547(b) now reads as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Conspicuous by its absence is the requirement that the Trustee prove that an insider had actual knowledge or reasonable cause to believe that the debtor/transferor was insolvent at the time of the transfer.

### VI.

What is the measure by which the trustee must prove actual knowledge or reasonable cause to believe that a debtor is insolvent at the time that transfers or payments are made? The single issue that remains to be decided in this case is whether or not James A. Sweeney had actual knowledge or reasonable cause to believe that M.D.I. was insolvent at the time that the payments, totaling $71,200.00, were made to him. Until the enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984, actual knowledge or reasonable cause to believe that the Debtor was insolvent was an essential element necessary to avoid a preferential transfer to an insider. Actual knowledge was almost impossible to prove by a preponderance of the evidence; and although not quite as difficult, the proof necessary to establish reasonable belief of insolvency was also an ornerous burden to shoulder. Needless to say, there are not many creditor/transferees that will acknowledge to the trustee their knowledge of the debtor/transferor's precarious financial situation. The term "preferential transfer" implies that the trustee, when he seeks to use his avoiding powers in cases such as this, is going to be confronted with a recalcitrant debtor/transferor more often than not. As the case law developed, a more realistic approach to the establishment of this element emerged. Therefore, the test became that if a creditor had knowledge or notice of facts and circumstances that would incite a person of reasonable prudence to make inquiry, and such inquiry would lead to the development of facts revealing insolvency, that creditor would be charged with knowledge of insolvency.

The phrase "reasonable cause to believe that the debtor is insolvent" was taken from § 60(b) of the Bankruptcy Act of 1898. An analysis of that section appears in *Matter of Hadad*, 409 F.Supp. 106 (S.D. Ms.1970). That case held as follows:

Knowledge of insolvency is not necessary, nor even actual belief thereof; all that is required is a reasonable cause to believe that the debtor was insolvent at the time of the preferential transfer. A creditor has reasonable cause to believe that a debtor is insolvent when such a state of facts is brought to the creditor's notice, respecting the affairs and pecuniary condition of the debtor, as would lead a prudent business person to the conclusion that the debtor is insolvent. Of course, a creditor may not wilfully close his eyes that he might remain in ignorance of his debtor's condition. On the contrary, where circumstances are such as would incite a man of ordinary prudence to make inquiry, the creditor is chargeable with notice of all facts which a reasonably diligent inquiry would have disclosed. In such case, an inquiry of the debtor alone is generally insufficient, where his answer, under the circumstances, could readily have been found to be untrue. As a matter of fact, it is the creditor's cause for belief and not the debtor's knowledge, or lack of it, that is important. And if the creditor fails to make an inquiry when he has a duty to do so, he will be charged with all the knowledge which he would have acquired had he conducted such an investigation. [Footnotes omitted]

At 110, *citing*, 3 *Collier on Bankruptcy*, § 60.53 (14 Ed.1975).

*Mayo v. Pioneer Bank and Trust Company*, 297 F.2d 392 (5th Cir.1961) provides criptic insight in the following quote, to-wit:

It is clear, however, that a creditor has "reasonable cause to believe" that a debtor is insolvent. For reasonable cause to exist, it is not necessary that a person benefited by a transfer know positively that the result of the transaction will be to effect a preference: it is sufficient for a finding of reasonable cause that the person or his agent has knowledge of such facts as would induce a person of reasonable prudence to make inquiry, when such inquiry would have developed the facts essential to a knowledge of the situation. On the other hand, if the known facts should raise only a suspicion that the debtor might be insolvent, the test is not met.

At 394–95.

The cases are legion which support the above quoted proposition. *See, Clower v. First State Bank of San Diego, Texas,* 343 F.2d 808 (5th Cir.1965); *Feinblatt v. Block,* 456 F.Supp. 776 (D.Md.1978).

Appropriate to the case now before this Court is *Green v. A.G. Edwards and Sons, Inc.,* 582 F.2d 439 (8th Cir.1978), where the following language appears, to-wit:

It is clear, however, that a creditor may not ignore a debtor's precarious state of affairs. When circumstances exist that would incite a prudent business person to inquire into the debtor's affairs, a creditor who refuses or neglects to do so will be charged with notice of all facts a reasonably diligent inquiry would have disclosed. (citing cases)

At 443.

## VII.

The Defendant has denied that he knew M.D.I. was insolvent at the critical times that he received the three payments noted hereinabove. As expected, there is no direct proof that the Defendant had actual knowledge of M.D.I.'s insolvency, such as an admission or an incriminating document. There are indicators, however, that he had reasonable cause to believe that M.D.I. was insolvent and that further inquiry was incumbent upon him, as a person of reasonable prudence, to ascertain the precise status of M.D.I.'s financial health. These "red flags" are enumerated as follows:

1. Testimony of Randy L. Porter, former store manager for M.D.I. at Tupelo, Mississippi:

a. M.D.I. maintained daily records for sales, accounts payable, accounts receivable, bank balances, etc. The corporation maintained manual records, as well as, computer facilities. The books and records were accurate and would have been made available to the Defendant, James A. Sweeney.

b. The Defendant's son, J. Robert Sweeney, knew what was being spent by M.D.I. He prepared cash flows, budgets, and kept a close watch on the business activities.

c. J. Robert Sweeney took the books and records of M.D.I. to the Defendant's home in Germantown, Tennessee, on occasions when he would travel from the Tupelo store to the Fort Smith store.

d. The Defendant stated to Porter that the Fort Smith store was going to put M.D.I. out of business. In May, 1981, the Defendant told Porter that the Tupelo store could not offset the losses being encountered in Fort Smith.

e. Toward the end of 1981, Porter indicated that M.D.I. was not paying its trade creditors and was just barely making its payroll. As early as May, 1981, M.D.I. was delinquent in paying its vendors and suppliers.

2. Testimony of Sondra Pettit, former bookkeeper for M.D.I.:

a. In the Summer of 1981, M.D.I.'s problems, insofar as paying its vendors and suppliers, became serious. On December 1, 1981, approximately $55,000.00 in checks payable to M.D.I.'s vendors and suppliers were voided because funds were not available to honor the payments. (See Plaintiff's Exhibits M and N.)

b. During this same time period, Mrs. Pettit told J. Robert Sweeney that funds were not available in the bank account to pay the Defendant.

c. Mrs. Pettit testified that the books and financial records of M.D.I. reflected accurately its poor financial condition. In this context, she acknowledged that J. Robert Sweeney was well aware of M.D.I.'s problems in paying its bills. She related that a monthly printout was available which reflected the financial condition of M.D.I., and that accounts payable were run on the computer daily. She testified that an inventory of the non-computerized items of merchandise could be completed in approximately half a day, while an inventory of the merchandise, "keyed in" the computer, would take approximately three hours.

d. Mrs. Pettit corroborated Porter's testimony that the books and financial records of M.D.I. were taken by J. Robert Sweeney to his father's residence. She recalled conversations with the Defendant where she acknowledged to him that business conditions were bad. In response to an inquiry made by the Defendant, Mrs. Pettit related that "things were tough" and "things were not so good".

e. Mrs. Pettit also verified that M.D.I. maintained accurate, up-to-date business records that could be used, without substantial difficulty, to verify the financial condition of M.D.I. This information was accessible in December, 1981, and January, 1982.

3. Testimony of James Patterson, certified public accountant employed by M.D.I.:

a. Patterson indicated that J. Robert Sweeney, the Defendant's son, was a meticulous record keeper and had a keen awareness of financial matters.

b. He testified that M.D.I. was insolvent on December 31, 1981. In his opinion, a businessman could tell the condition of his business by comparing his bank account balances to the amount of debts owed to creditors.

c. Patterson advised that certain M.D.I. departments were set up on a percentage of profits to sales. Therefore, the level of sales for these departments would indicate whether profits would be forthcoming at a later date.

4. Testimony of J. Robert Sweeney, the Defendant's son and former president of M.D.I.:

a. The Defendant was a member of the M.D.I. board of directors at the time of the payments made to him in December, 1981, and January, 1982, and as such, was charged with knowledge of the management of the business.

b. Sweeney acknowledged that a number of checks were voided in December, 1981, because funds were not available to honor these checks; the payees being the vendors and suppliers of M.D.I.

5. Testimony of Russell Truell, former vice president of M.D.I.:

a. Most of the items of inventory were "keyed in" the computer, these being the items of catalog merchandise. Approximately 40% of the inventory value was based on "back of the house" items which were physically located at the Tupelo, Mississippi, store.

b. Truell indicated that an inventory of the "back of the house" items or hard goods would reflect an 85% to 95% reliability as to value.

Considering the "red flags" interspersed throughout the testimony, the conclusion becomes obvious that the Defendant had reasonable cause to believe that M.D.I. was insolvent at the time that he received the three payments under the promissory notes, executed in his favor, in December, 1981, and January, 1982. As such, all of the elements of § 547(b) have been established by a preponderance of the evidence. The three payments made to the Defendant are hereby voided and set aside as preferential transfers. Judgment will be rendered in favor of the Trustee against the Defendant in the sum of $71,200.00, plus interest accruing hereafter at the highest rate according to law.

An Order will be entered consistent with this Opinion.